**OGLALA SIOUX TRIBE OF the PINE RIDGE INDIAN RESERVATION, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 735–85L.

United States Claims Court.

July 24, 1990.

See also 15 Cl.Ct. 615.

Frances L. Horn, Washington, D.C., Atty. of Record, for plaintiff.

Pamela S. West, Washington, D.C., with whom was Asst. Atty. Gen., Richard B. Stewart, for defendant.

## OPINION

REGINALD W. GIBSON, Judge:

In this case, the Oglala Sioux Tribe (the Tribe) seeks money damages from the United States (defendant), acting through the Department of Interior, Bureau of Indian Affairs (BIA), for the mismanagement of certain Tribe assets. Jurisdiction in this court is premised upon the Tucker Act, 28 U.S.C. § 1491,[1] and the "Indian" Tucker

---

1. 28 U.S.C. § 1491(a)(1) (1988) provides in pertinent part:

The United States Claims Court shall have jurisdiction to render judgment upon any claim against the United States founded either

Act, 28 U.S.C. § 1505.[2] As a further basis for jurisdiction, the Tribe avers that it is entitled to the payment of money damages flowing from a purported breach of fiduciary obligations imposed by a trust relationship arising from the various statutes and regulations that govern the Oglala Sioux Tribe Land Acquisition Enterprise (OST-LAE).

The defendant has filed a motion for summary judgment, or in the alternative, partial summary judgment. As the basis for its motion in the entirety, the defendant asserts that the allegations raised by the Tribe in its petition are outside the jurisdiction of this court because the relevant statutes and regulations which constitute the substantive law upon which the Tribe relies do not impose any fiduciary obligations for the management of Tribe assets, and thus, those statutes and regulations *do not* create a right to money damages.[3] The defendant also moves alternatively for partial summary judgment, arguing that one of the claims asserted by the Tribe, wherein it is alleged that the defendant is required to maximize the income derived from tribal lands, is not a claim upon which relief can be granted.[4] The Tribe has filed a cross-motion for partial summary judgment to confirm the existence of jurisdiction. Moreover, by its partial motion regarding jurisdiction, the Tribe necessarily seeks to establish that a trust relationship was created by the defendant's "elaborate" statutory and regulatory control, which, in turn, generated fiduciary obligations for the asset management claims asserted here. For the reasons stated hereinafter, both of the motions asserted by the defendant are DENIED. Conversely, the Tribe's motion for *partial* summary judgment is GRANTED.

FACTS

The Tribe is a band of American Indians which has been in existence since time immemorial both as a part of the Sioux Indian Nation and in its own right. It has sovereignty over the Pine Ridge Indian Reservation, which is located in the State of South Dakota. Its relationship with the defendant was established as early as 1825, and has varied over the succeeding years according to various treaties and other Acts of Congress. Thus, the Treaty of July 5, 1825, 7 Stat. 252, 2 Kapp. 230, was a treaty of peace and friendship in which the Tribe acknowledged the supremacy of the United States and claimed its protection. By the Fort Laramie Treaty of September 17,

---

upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States....

**2.** 28 U.S.C. § 1505 (1988) provides:
The United States Claims Court shall have jurisdiction of any claim against the United States accruing after August 13, 1946, in favor of any tribe, band, or other identifiable group of American Indians residing within the territorial limits of the United States or Alaska whenever such claim is one arising under the Constitution, laws or treaties of the United States, or Executive orders of the President, or is one which otherwise would be cognizable in the Claims Court if the claimant were not an Indian tribe, band or group.
As clearly contemplated by the statute, 28 U.S.C. § 1505 provides tribal claimants with the same access to this court as that provided to individual claimants under 28 U.S.C. § 1491. *United States v. Mitchell,* 463 U.S. 206, 211, n. 8, 103 S.Ct. 2961, 2965, 77 L.Ed.2d 580 (1983) (*Mitchell II*), *citing United States v. Mitchell,* 445 U.S. 535, 538–540, 100 S.Ct. 1349, 1351–1352, 63 L.Ed.2d 607 (1980) (*Mitchell I*). An important goal of the Indian Tucker Act was to ensure that Indians would be given " 'their fair day in court so that they can call the various Government agencies to account on the obligations that the Federal government assumed.'" *Mitchell II,* 463 U.S. at 214, 103 S.Ct. at 2966, *quoting* statements of Rep. Jackson, 92 Cong.Rec. 5312.

**3.** The defendant styles its motion as one for summary judgment pursuant to RUSCC 56, wherein it challenges the jurisdiction of this court. Because of the frontal challenge to this court's jurisdiction, the defendant's motion is in reality a motion to dismiss, which should have been asserted pursuant to RUSCC 12(b)(1). Henceforth, we shall treat the primary motion as one to dismiss under that rule to the extent that the defendant alleges lack of jurisdiction.

**4.** RUSCC 12(b)(1) also addresses motions for a failure to state a claim upon which relief can be granted. However, RUSCC 12(b) also states that such motions shall be treated as a motion for summary judgment under RUSCC 56. Therefore, the defendant's alternative motion for partial summary judgment is properly framed under the rules, and we will dispose of this alternative motion according to the standards that are applicable to motions made under RUSCC 56.

1851, 11 Stat. 749, 2 Kapp. 594, the boundaries of the Sioux Nation were defined to include an area of what is presently known as the Pine Ridge Indian Reservation. The United States created "the Great Sioux Reservation" by the Treaty of April 29, 1868, 15 Stat. 635, 2 Kapp. 998, setting boundaries which again included the area of what is now the Pine Ridge Reservation. By the Act of September 26, 1876, 19 Stat. 254, 1 Kapp. 168, which was executed after an unsuccessful attempt to persuade the Sioux Indians to move to the Oklahoma Territory, the Sioux Nation ceded all lands outside the newly defined boundaries of the Great Sioux Reservation. The Oglala Sioux Tribe has not recognized the validity of this purported cession, but nevertheless, the lands of the Pine Ridge Indian Reservation were wholly contained within the boundaries described in the 1876 agreement.

The Act of March 2, 1889, 25 Stat. 888, 1 Kapp. 328, provided for the division of the Great Sioux Reservation defined by the Act of September 26, 1876. Thus, by the Act of March 2, 1889, each tribe of the Sioux Nation ceded whatever interest it may have had in those lands outside of the reservation assigned to the lands that were presently occupied by each particular tribe. The Oglala Sioux Tribe was, and has been, confined to an area that now composes the Pine Ridge Reservation. The boundaries of the Pine Ridge Reservation are described in section 1 of the Act of March 2, 1889, and the present action is concerned only with lands located on and in that reservation.

Subsequently, pursuant to the Indian Reorganization Act (IRA) of June 18, 1934, 48 Stat. 984–988, *codified as amended at* 25 U.S.C. §§ 461–479 (1988), the Oglala Sioux Tribe organized its own tribal government by adopting a constitution and by-laws pursuant to the authority granted under section 16 of the IRA, 48 Stat. 987, *codified as amended at* 25 U.S.C. § 476 (1988). Under its constitution, the Oglala Sioux Tribe is empowered to purchase land from, or exchange land with, individual Indians on the Pine Ridge Reservation upon the approval of both the Tribal Council and the Secretary of the Interior. The constitution also authorizes the Tribe to issue leases and grazing permits for tribal lands, again subject to the approval of the Tribal Council and the Secretary of the Interior. Tribal land which is not leased or assigned to individual Indians must, under the constitution, be managed by the Tribal Council for the benefit of the entire Tribe, and any income derived from such land must accrue to the benefit of the Tribe as a whole.

On November 3, 1961, the Tribal Council adopted Resolution 61–68. It recognized that Indian land on the Pine Ridge Reservation was quickly passing out of trust status. The vast majority of the land was in heirship status; ownership was so fractionalized that many Indians were unable to fully utilize their land. The Pine Ridge Reservation had become a checkerboard of tribal, allotted, heirship, and non-trust land, which prevented its maximum use. Thus, the Tribal Council requested "that a planned and comprehensive land acquisition and consolidation program be established on the Pine Ridge Indian Reservation...."

Resolution 61–68 set out nine suggestions to implement the proposed program: 1) a change in BIA regulations governing land exchanges between the Tribe and those holding heirship interests; 2) a change in BIA regulations governing land exchanges so as to permit exchanges for less than appraised value; 3) a reorganization and supplementary staffing of the BIA branch responsible for the Pine Ridge Reservation; 4) an effort by the BIA to locate land acquisition opportunities for the Tribe for the purpose of consolidating tribal lands in certain counties; 5) an immediate appropriation of $100,000 from the BIA Revolving Loan Fund,[5] so as to enable the Tribe to purchase non-trust land; 6) a $600,000 appropriation from the BIA Revolving Loan Fund, so as to enable the Tribe to purchase heirship interests; 7) au-

5. The Revolving Loan Fund was pursuant to the authority of section 10 of the IRA, 48 Stat. 986, *codified as amended at* 25 U.S.C. § 470 (1988), "for the purpose of promoting the economic development of [Indian chartered corporations] and their members...."

thorization for the Executive Committee to hire adequate staff, including tribal clerks, a tribal appraiser, and a tribal land manager to expedite the tribal land acquisition program; 8) a change in BIA regulations and procedures to facilitate the proposed land acquisition and consolidation; and 9) a continuation on a BIA moratorium on supervised sales.

Resolution 61–68 was implemented by the Tribal Council on March 2, 1962, pursuant to the adoption of Resolution 62–6. Resolution 62–6 was approved by the Superintendent of the Pine Ridge Indian Agency on March 9, 1962. The land program instituted by Resolution 62–6 was founded upon a premise of mutual cooperation, whereby the Tribe and the BIA agreed to work together through the Realty Branch of the BIA. It called for the BIA to provide skilled resource planning personnel who, working with the Tribe Reservation Planning Committee, were to designate areas of the reservation with the most potential for maximum diversified economic use. The Tribe and the BIA were to work towards the consolidation of various undivided individual heirship interests into a contiguous tract of single ownership interest. It suggested that this could be accomplished through exchanges, sales with proceeds reinvestment, or outright purchase of small minority interests.

The objective of heirship consolidation was to reduce the scattered number of inherited interests to bring them together in useable, manageable tracts. The land program was conducted by a tribal organization called the Oglala Sioux Tribal Land Acquisition Enterprise (OSTLAE). The land program was a continuation and an expansion of the prior functions of the OSTLAE, which was a previously-existing organization. The OSTLAE was authorized to use tribal lands to facilitate the exchange and sale of allotted lands in aid of the land acquisition program. It was further authorized to borrow funds from the government on a feasible economic repayment schedule to finance land purchases under the program.

Thus, the OSTLAE was given the power to: a) borrow an additional $600,000 from the BIA Revolving Loan Fund for needs arising over the first three years; b) borrow an additional $1,200,000 from the BIA Revolving Loan Fund if needed in future years; and c) pledge the income from 50,-000 acres of tribal land and purchased tracts in order to provide security for the financial obligations undertaken by the OSTLAE and to guarantee the economic feasibility of its operations.

Such income was in fact pledged by the OSTLAE, in addition to a promise to pledge the income from additional tribal lands if such was deemed necessary to keep the OSTLAE in sound financial condition. The Tribe proceeded to purchase undivided individual heirship interests. Every transaction was approved by the Secretary of the Interior. This is true because the authority of both the seller and purchaser of allotted lands suffering from heirship interests is subject to statute, regulation, and the Oglala Sioux Tribe constitution. Accordingly, every offer to sell, and every acceptance by the Tribe must be approved by the Secretary of the Interior before title will pass from the individual Indian seller to the Tribe as buyer.

On March 19, 1968, the Tribe, in order to obtain funds in larger quantities, executed an agreement entitled "General Assignment and Assignment of Income" with the BIA Revolving Loan Fund. Under that agreement, the OSTLAE secured loans for the purchase of undivided individual heirship interests by pledging all tribal income to the United States. This pledge was in consideration for BIA loan approval. Additional funds were loaned to the Tribe by the Department of Agriculture, acting through the Farmers Home Administration (FmHA), as early as January 17, 1968. Initially, those loans were secured by the same pledge of *all* tribal income under the March 19, 1968 "General Assignment and Assignment of Income." Therefore, by that assignment the Tribe pledged all tribal income to the United States as security for loans made by both the BIA and the FmHA.

However, in 1971 and succeeding years, the Tribe obtained all of the funds for its land acquisition program through the FmHA. After the FmHA took over the lending program, the Tribe borrowed funds pursuant to a series of tribal resolutions which permitted the issuance of installment promissory notes in the amount of $16,900,000 for the purchase of approximately 206,535.36 acres of land.[6] On January 17, 1978, in view of this lending activity, the Department of the Interior, acting for the BIA, executed a "Subordination Agreement," whereby all BIA rights to tribal income under the March 2, 1968 "General Assignment and Assignment of Income" were subordinated to the interests of the FmHA as loan security.

Moreover, on October 9, 1979, the Tribe and the BIA executed the "Assignment of Oglala Sioux Tribal Land Acquisition Enterprise Income and Funds." Therein the Tribe assigned all tribal income[7] to the FmHA. The Tribe and the BIA further agreed "not to divert any funds ... until the annual FmHA payment is made...." The terms of both documents, the January 17, 1978 "Subordination Agreement" and the October 9, 1979 "Assignment of Oglala Sioux Tribal Land Acquisition Enterprise Income and Funds," were made part of the several loan contracts between the Tribe and the FmHA.

Also central to this case are two Memoranda of Understanding (MOUs) executed between the Tribe and the BIA at the urging, and with the approval of, the FmHA, which was also a party to the agreement.[8] The first is a May 24, 1976 Memorandum of Understanding (1976 MOU). At the outset, the 1976 MOU recited the facts relevant to the status of the land acquisition up to that point, i.e., the Tribe was "engaged in a land acquisition program to purchase land within its Reservation under the auspices of the Oglala Sioux Tribal Land Acquisition Enterprise [OSTLAE]"; and the OSTLAE received "income from 50,000 acres of land pledged to the Enterprise by the Tribe in 1959, from lands purchased through loans from the BIA Indian Revolving Loan Fund and from loans from the Farmers Home Administration, United States Department of Agriculture [FmHA]."

Thus, the Tribe executed the 1976 MOU because it wished "to acquire additional land and [had] requested an additional FmHA loan in the amount of $3,000,000." The MOU was necessary because the FmHA desired that "before the loan request is approved, the Tribe and the BIA implement a specific plan for the maintenance of land records and the collection of the revenues of the OSTLAE." The parties also recognized that "the BIA has a special trust responsibility with respect to

6. There are six (6) resolutions which specify the number of acres of land desired by the Tribe, and the loan amounts deemed necessary for such purchases. No evidence has been submitted by either party, however, showing the

| Resolution 71–55 | 6/23/71 | $ 1,900,000 | 50,735.36 | acres |
| Resolution 77–112 | 9/29/77 | $ 3,000,000 | 28,800 | acres |
| Resolution 78–200 | 12/6/78 | $ 3,000,000 | 33,500 | acres |
| Resolution 79–107 | 9/13/107 | $ 3,000,000 | 33,500 | acres |
| Resolution 80–70 | 7/17/80 | $ 3,000,000 | 24,000 | acres |
| Resolution 83–63 | 4/18/83 | $ 3,000,000 | 36,000 | acres |
| | | $16,900,000 | 206,535.36 | acres. |

7. The "Assignment of Oglala Sioux Tribal Land Acquisition Enterprise Income and Funds" defines tribal income in the following manner: [A]ll annual gross revenues from the land purchased with the Loan and all funds of or assigned to the Oglala Sioux Tribal Land Acquisition Enterprise held in the United States Treasury in trust for or for the benefit of the Land Acquisition Enterprise from the following sources: interest earnings from investments, interest earnings from funds in the

actual sums borrowed by the Tribe or the number of acres purchased by the Tribe. Nevertheless, we note that the Tribe made the following resolutions on proposed land acquisitions:

United States Treasury, prospecting fees, grazing leases and permits on tribal lands, farming leases on tribal lands, other payments on tribal lands (ASC payments, etc.), oil and gas leases and bonuses, and damage payments.

8. It is undisputed that the two Memoranda of Understanding were executed by authorized officials of the BIA and the FmHA.

the land held in trust for the Tribe by the United States and desire[d] to assist the Tribe in operating the OSTLAE and in qualifying for the additional FmHA loan." Consequently, "in consideration of the promises and for other good and valuable consideration, receipt of which is hereby acknowledged," the Tribe and the BIA agreed to certain procedures that would govern the maintenance of land records and the collection of OSTLAE revenues.

Those portions of the 1976 MOU relevant to this case provide:

1. *Responsibilities and Personnel*

1.1 The BIA shall assume principal responsibility for the maintenance of the records of all land held in trust by the United States for the Tribe and the collection of the revenues of the tribal lands including the maintenance of the land records and the collection of the revenue of the OSTLAE, which records and collections shall be separate and distinct from the records of and collections from other tribal lands. The land record and revenue collection program for the OSTLAE shall be supervised by the [BIA] Realty Office, Pine Ridge Agency.

\* \* \* \* \* \*

2. *Maintenance of Land Records*

2.1 The BIA shall assume principal responsibility for maintaining records of Tribal land on the Reservation with respect to ownership, leasing and acreage, along with tract designation. The BIA shall maintain a centralized record system, under the supervision of the Realty Officer, Pine Ridge Agency, which shall consist of a master card system with a card for each tract of land. Each card shall include information regarding acquisition, amount of rental and other descriptive information.

\* \* \* \* \* \*

3. *Collection of Revenues*

3.1 The BIA shall assume responsibility for collecting all lease income and revenues of the Tribe and shall be the custodian of all income and revenues pledged for the repayment of the FmHA land purchase loans. The BIA shall maintain an accounting system to provide informa-

tion with regard to purchases and exchanges of land, receipts of rent and payments for operation, maintenance and retirement of the FmHA debt and other obligations of the Enterprise.

\* \* \* \* \* \*

3.3 All revenues pledged to the OST-LAE, along with revenue from Tribal lands not pledged to the Enterprise, shall be collected by a BIA authorized Collection Officer and deposited in the Oglala Sioux Tribe's account ... in the United States Treasury.

(A) The BIA ... shall pre-bill permittees and lessees [for bill collections on] all Tribal grazing rental fees and agricultural lease fees....

(B) Income codes specifically identifying assigned income shall be established in the BIA accounting system;

(C) The bills shall require guaranteed remittances made payable to the [BIA]. The revenues shall be collected by [the BIA] for deposit. Revenue assigned [to the] FmHA shall be specifically coded at the time of billing and/or collection, as Pledged Income;

\* \* \* \* \* \*

3.4 Before the beginning of each fiscal year, the Tribe shall prepare ... and submit to the [BIA] Area Director for approval an annual OSTLAE budget....

\* \* \* \* \* \*

3.5 The [BIA] Area Director shall be authorized to maintain the Tribe's funds in [a] U.S. Treasury Account ... in accordance with the Tribe's annual OST-LAE budget....

\* \* \* \* \* \*

3.7 The BIA shall invest at the highest interest rate available all funds set aside as the "Reserve Amount" [reserve funds for FmHA loan repayment deposited in the Tribe's U.S. Treasury Account and maintained by the BIA Area Director].

\* \* \* \* \* \*

4. *General Tribal Revenues*

4.1 Before the beginning of each fiscal year, the Tribe shall prepare ... and

submit to the [BIA] Area Director for approval an annual General Tribal Budget which shall include (1) the estimated lease and farm rental income not pledged to [the] FmHA, which shall be deposited by the BIA in the Tribe's U.S. Treasury Account ... and (2) estimated general Tribal expenditures.

Subsequently, on July 13, 1983, the Tribe, the BIA, and the FmHA executed another MOU (1983 MOU) which modified the responsibilities outlined in the previous agreement. The primary reason for the 1983 MOU was to create separate trust fund accounts for the Tribe, in order to segregate monies that had been pledged to the OSTLAE from those monies that were not pledged directly to the OSTLAE. By section 3.3 of the 1976 MOU the Tribe and the BIA had agreed that "[a]ll revenues pledged to the OSTLAE, along with revenues from Tribal lands not pledged to the Enterprise, shall be collected by [the BIA] and deposited [in a single Tribe account in the United States Treasury]." This provision was changed by the 1983 MOU, such · that section 3.3 now provides:

> 3.3 All revenues pledged to the OST-LAE shall be collected by [the BIA] and deposited in the Oglala Sioux Tribe's account, Activity 14X7112, in the United States Treasury. All revenues from Tribal lands not pledged to the Enterprise shall be collected by [the BIA] and deposited in the Oglala Sioux Tribe's account, Symbol 14X7274, in the United States Treasury.

## CONTENTIONS OF THE PARTIES

### A. *Plaintiff*

By its petition, the Tribe alleges that the defendant has mismanaged tribal funds and property. Under Count I, it is averred that the defendant "has at all times been under a duty as a guardian and trustee of plaintiff and its property, to prudently manage and administer all sums of plaintiff's money held by defendant whether by way of principal or interest and to diligently carry out obligations which it has undertaken in connection with plaintiff's land acquisition program." Thus, the Tribe contends that the defendant has breached its fiduciary obligations by (i) its failure to prudently manage those funds held in trust for the Tribe; (ii) its failure to comply with those record keeping, billing, collection, and accounting practices set out in both the 1976 and 1983 Memoranda of Understanding; (iii) its negligent management of the recording, custody, maintenance, use, and certification of OSTLAE property title documents; (iv) its mismanagement of the purchase, exchange, leasing, and permitting of pledged OSTLAE lands; and (v) its failure to prudently manage tribal lands so as to maximize the income from lands acquired under the program. Under Count II, the Tribe avers that it is entitled to an accounting in order to determine the full extent of the defendant's fund and land mismanagement liability.[9]

By its motion for partial summary judgment, the Tribe seeks to demonstrate that the various statutes and regulations [10] which allegedly constitute the substantive law in this case established a trust relationship between it and the defendant for the management of tribal lands and funds associated with the land acquisition program. By that trust relationship, it is the Tribe's assertion that fiduciary obligations were created for each of the claims alleged, the breach of which entitles the Tribe to money damages. In sum, according to the Tribe, jurisdiction exists in view of the defendant's "elaborate" statutory and regulatory control over the land acquisition program which is sufficient to establish fiduciary obligations. Thus, the breach of those obligations is enough to require the pay-

---

**9.** The Tribe describes this matter as an accounting case under the *Klamath* theory. *See Klamath and Modoc Tribes and Yahooskin Band of Snake Indians v. United States,* 174 Ct.Cl. 483 (1966). Thus, the Tribe relies on *Klamath* for the proposition that, if it is proven that the defendant has breached its fiduciary obligations, this court may require an accounting in aid of its jurisdiction to render a money judgment on those claims.

**10.** The Tribe relies on a plethora of statutes and regulations in support of its position. Those most relevant to the disposition of this case are discussed *infra.*

ment of compensation, an indispensable element for jurisdiction in the Claims Court.

### B. *Defendant*

By its motion, the defendant argues that, under *United States v. Mitchell,* 463 U.S. 206, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983) (*Mitchell II*), this case is not within the jurisdiction of the Claims Court. It further argued that the statutes and regulations composing the substantive law relied on do not create the required "special, very pervasive" trust relationship that is necessary in order to establish a right to money damages in the event of a breach. Moreover, the defendant asserts that even if one were to assume that it had "elaborate control" over the Tribe's assets associated with the land acquisition program, the statutes and regulations implicated here do not give rise to any fiduciary obligations with respect to the management of those assets. Thus, there being no fiduciary obligations, the defendant contends that there can be no breach of trust which would establish a right to money damages, a jurisdictional prerequisite for every claim in this court.

It is the defendant's position that it is the Tribe that exercises the dominant control over the Tribal assets at issue in this case, not the BIA. In its view, the Tribe "has had, and still has, the decisive, major management role [in] borrowing money, purchasing lands, leasing or permitting these lands, and in repaying the borrowed monies as part of the overall land consolidation program." Moreover, the defendant maintains that its version of the management roles of the parties is supported by the Oglala Sioux Tribal constitution, the land acquisition program adopted by the Tribe, BIA regulations which govern the leasing and permitting of tribal lands, the 1976 and 1983 MOUs. In short, the defendant denies that it exercised an elaborate amount of control over the land acquisition program of the Tribe sufficient to confer jurisdiction on this court pursuant to the guidelines set out in *Mitchell II.*

The defendant also moves, in the alternative, for partial summary judgment. Specifically, the defendant argues that the Tribe's allegation that the defendant had a general obligation to maximize income from land acquired under the program, along with other tribal resources, is not a cognizable claim against the United States.

## DISCUSSION

### A. *Motion To Dismiss For Lack of Jurisdiction*

■ The central issue in subject motion to dismiss is—whether this court has jurisdiction over the noted asset management claims asserted by the Tribe. Stated differently, the issue is—whether plaintiff has stated a claim within the jurisdiction of this court either in terms of basing the same on monetary relief stemming from statutory or regulatory violations or in terms of a breach of contract. The court accepts all of plaintiff's factual allegations as true for purposes of the motion. In deciding this question, a review of the jurisdictional foundation for the alleged claims is helpful. The Tribe relies on the Tucker Act, 28 U.S.C. § 1491(a)(1), *see* note 1, *supra,* and the "Indian" Tucker Act, 28 U.S.C. § 1505, *see* note 2, *supra,* as a general basis for jurisdiction. The jurisdictional validity of the claims at bar, premised on the Tucker Act, is governed by *Mitchell II.* There the Supreme Court stated that "[f]or decades this Court [has] consistently interpreted the Tucker Act as having provided the consent of the United States to be sued *eo nomine* for the classes of claims described in the Act." *Mitchell II,* 463 U.S. at 215, 103 S.Ct. at 2967 (citations omitted). However, the fact that the Tucker Act effects a waiver of sovereign immunity does not mean that it also creates a substantive right to money damages, *i.e.,* a right on which a claim must be founded for jurisdiction in this court. "It nonetheless remains true that the Tucker Act 'does not create any substantive right enforceable against the United States for money damages.'" *Mitchell II,* 463 U.S. at 216, 103 S.Ct. at 2967, *quoting United States v. Mitchell,* 445 U.S. 535, 538, 100 S.Ct. 1349, 1351, 63 L.Ed.2d 607 (1980) (*Mitchell I*), and *United States v. Testan,* 424 U.S. 392, 398, 96 S.Ct. 948, 953, 47 L.Ed.2d 114 (1976).

"[The] substantive right [to recover money damages] must be found in some other source of law, such as 'the Constitution, or any Act of Congress, or any regulation of an executive department [or upon any express or implied contract with the United States].'" *Mitchell II*, 463 U.S. at 216, 103 S.Ct. at 2967, *quoting* 28 U.S.C. § 1491. The right to recover money damages is an essential ingredient for suit in this court because its jurisdiction is limited to claims for money damages. *Mitchell II*, 463 U.S. at 216, 103 S.Ct. at 2968, *citing United States v. King*, 395 U.S. 1, 2–3, 89 S.Ct. 1501, 1501–1502, 23 L.Ed.2d 52 (1969). "[T]he claimant must demonstrate that the source of substantive law he relies upon 'can fairly be interpreted as mandating compensation by the Federal Government for the damage sustained.'" *Mitchell II*, 463 U.S. at 216–217, 103 S.Ct. at 2968, *quoting United States v. Testan*, 424 U.S. at 400, 96 S.Ct. at 954, and *Eastport Steamship Corp. v. United States*, 178 Ct.Cl. 599, 607, 372 F.2d 1002, 1009 (1967). "The substantive source of law may grant the claimant a right to [money] damages either 'expressly or by implication.'" *Mitchell II*, 463 U.S. at 217, 103 S.Ct. at 2968, n. 16, *quoting Eastport Steamship Corp. v. United States*, 178 Ct.Cl. at 605, 372 F.2d at 1007.

Ultimately then, "for claims against the United States 'founded either upon the Constitution, or any Act of Congress, or any regulation of an executive department, [or upon any express or implied contract with the United States,]' 28 U.S.C. § 1491, a court must inquire whether the source of substantive law can fairly be interpreted as mandating compensation by the Federal Government for the damages sustained." *Mitchell II*, 463 U.S. at 218, 103 S.Ct. at 2968. If the Tribe can appropriately demonstrate the existence of this substantive right, it need not also show a separate waiver of sovereign immunity in that substantive provision because the Tucker Act provides the necessary consent. *Mitchell II*, 463 U.S. at 218, 103 S.Ct. at 2968. "[T]here is simply no question that the Tucker Act provides the United States' consent to suit for claims founded upon statutes or regulations that create substantive rights to money damages." *Mitchell II*, 463 U.S. at 218, 103 S.Ct. at 2969.

In view of the foregoing, the ultimate question is—whether the Tribe has any substantive rights, arising by virtue of statute, regulation, or contract, the violation and/or breach of which can be fairly interpreted as requiring the payment of money damages. At bar the Tribe has premised its money damage claims against the United States on the violation of various Acts of Congress and executive department regulations. It also asserts that it is entitled to money damages for the defendant's violation of the obligations imposed by the 1976 and 1983 Memoranda of Understanding. Therefore, like the Supreme Court in *Mitchell II*, we will first implicate the statutes and regulations constituting the substantive law which allegedly were violated. We will then determine—whether they can be fairly interpreted as mandating compensation for any damages arising from any breach of the duties imposed by those statutes and regulations. Finally, we will examine the 1976 and 1983 Memoranda of Understanding and also determine if they provide the requisite contractual bases for jurisdiction in this court.

The substantive law in this case is composed of numerous statutes and regulations governing BIA authority vis-a-vis the disposition of those tribal monies and lands connected with the land acquisition program. In this context, we agree with the Tribe that our focus is properly directed towards a consideration of any and all statutory and regulatory duties, cited by the Tribe in both its Petition and Cross–Motion for Partial Summary Judgment, bearing on tribal land purchases, land sales, land exchanges, land leasing, and land permitting. Additionally, our inquiry must include an examination of those record-keeping duties regarding fee and income collection, and other related functions connected with the land acquisition program. We hereinafter address, seriatim, those statutes and regulations which most clearly support the existence of fiduciary obligations and concom-

itant right to money damages asserted by the Tribe.

### 1. *The Statutes*

The Act of June 30, 1834, § 17, 4 Stat. 738, *codified at* 25 U.S.C. § 9 (1988), gives the President the power to prescribe regulations to carry out any act relating to Indian affairs. By the Act of July 9, 1832, § 1, 4 Stat. 564, as amended by the Act of July 27, 1868, § 1, 15 Stat. 228, *codified as amended at* 25 U.S.C. § 2 (1988), the Commissioner of Indian Affairs has the power to manage all Indian affairs, subject to the direction of the Secretary of the Interior and Presidential regulations. The Commissioner of Indian Affairs is further empowered and directed to keep a record of every deed executed by any Indian requiring the approval of either the President or the Secretary of the Interior. Act of July 26, 1892, § 2, 27 Stat. 273, *codified at* 25 U.S.C. § 5. Thus, by virtue of 25 U.S.C. §§ 5 and 9, the authority and responsibility for the maintenance of land records involving Indian trust lands is vested in the Secretary of the Interior and the Commissioner of Indian Affairs.[11]

The Tribe also cites to various provisions of the IRA of June 18, 1934, 48 Stat. 984–988, *codified as amended at* 25 U.S.C. §§ 461–479 (1988), for the proposition that it establishes a governmental policy to encourage tribal acquisition of land within reservation boundaries. Thus, the IRA, § 3, 48 Stat. 984, *codified at* 25 U.S.C. § 463 (1988), authorizes the Secretary of the Interior to restore those surplus lands within an Indian reservation to tribal ownership. The IRA, § 5, 48 Stat. 985, *codified at* 25 U.S.C. § 465 (1988), authorized the Secretary of the Interior to acquire lands both inside and outside existing reservations for the purpose of providing land for Indians.[12] The Secretary of the Interior is directed pursuant to IRA, § 6, 48 Stat. 986, *codified at* 25 U.S.C. § 466 (1988), to make rules and regulations restricting grazing on Indian range units, and to promulgate rules and regulations to protect the range from deterioration, soil erosion, and to assure full utilization of the range "and like purposes."[13] Under the authority of the IRA, § 10, 48 Stat. 986, *codified as amended at* 25 U.S.C. § 470 (1988), the Secretary was also authorized to make

**11.** This is true because 25 U.S.C. §§ 5 and 9 provide the authority for 25 C.F.R. Part 150, which sets both BIA regulatory policies governing the recording, maintenance, use, and certification of title documents, and the issuance of title status reports for Indian land. 25 C.F.R. § 150.1. *See infra.*

**12.** The defendant correctly notes that the predecessor Court of Claims has stated that § 5 of the IRA, 25 U.S.C. § 465, creates a trust extending "only to ownership of, or rights in, real property acquired *by the United States* pursuant to the [IRA]." *Hydaburg Cooperative Association v. United States,* 229 Ct.Cl. 250, 256, 667 F.2d 64, 67 (1981) (emphasis in original). Thus, relying on the reasoning of *Mitchell I,* 445 U.S. at 542–544, 100 S.Ct. at 1354–1355, the Court of Claims held that "the trust established by section 5 of the [IRA, 25 U.S.C. § 465] imposes only a duty on the United States to hold acquired Indian lands so as to prevent continued alienation ... [it] does not itself impose 'unambiguously impose' a fiduciary duty on the United States to promote all assets or enterprises acquired by the Indians pursuant to the [IRA]." *Hydaburg,* 229 Ct.Cl. at 257, 667 F.2d at 68 (emphasis in original).

The *Hydaburg* decision does not, however, change our conclusion in this case because the jurisdictional claim asserted by the Tribe here is different than that alleged by the Indians in

*Hydaburg.* The Tribe cites the various provisions of the IRA *only as background* for the proposition that it established a policy to encourage tribal acquisition of ownership over lands located within reservation boundaries. It does not assert that § 5, 25 U.S.C. § 465, or any other *single* provision of the IRA, with the exception of § 6, 25 U.S.C. § 466, create fiduciary obligations *in and of themselves.* Rather, relying on the reasoning in *Mitchell II,* which we note was decided subsequent to *Hydaburg,* the Tribe contends that a number of other statutes, regulations, and written agreements, *taken together,* establish such pervasive governmental control over the Tribal assets at issue so as to create fiduciary obligations. Thus, in view of *Mitchell II* and other indicia of fiduciary obligations outside of the IRA, which create general trust duties that are supplemented by more specific trust duties giving rise to fiduciary obligations found in other statutes, regulations, and documents, the Court of Claims' decision in *Hydaburg* is not dispositive of the jurisdictional question presented here.

**13.** In *Hydaburg,* 229 Ct.Cl. at 258, 667 F.2d at 68, the Court of Claims emphasized that the management duties detailed in § 6 of the IRA, 25 U.S.C. § 466, along with its implementing regulations, are sufficient to support a claim within our jurisdiction.

loans to Indians out of a revolving loan fund for the purpose of promoting the economic development of Indian tribes and their members.

In conjunction with these provisions of the IRA, the Tribe further relies on the Act of April 11, 1970, Pub.L. No. 91–229, § 1, 84 Stat. 120, *codified at* 25 U.S.C. § 488 (1988). There the Department of Agriculture is authorized to make loans through the FmHA to recognized Indian tribes for use in the purchase of land within the reservation pursuant to the authorization of the IRA.[14] The Tribe advances still more statutes in support of its assertion that the defendant exercised a pervasive level of management control over the Tribe's assets. It points to acts which authorize the defendant to hold and manage tribal monies. For example, the Tribe relies on the Act of June 24, 1938, § 1, 52 Stat. 1037, *codified as amended at* 25 U.S.C. § 162a, under which the Secretary of the Interior is authorized and directed to invest tribal funds.

Also basic to the asserted premise of elaborate management control by the defendant are certain statutes which limit the right of Indians to dispose of land in the absence of specific statutory authorization. *See, e.g.,* the IRA, § 4, 48 Stat. 985, *codified as amended at* 25 U.S.C. § 464 (1988) (lands may not be transferred without approval from the Secretary of the Interior); the Act of May 27, 1902, § 7, 32 Stat. 275, *codified at* 25 U.S.C. § 379 (1988) (sale of allotted lands by heirs subject to approval by the Secretary of the Interior); the Act of September 21, 1922, § 6, 42 Stat. 995, *codified at* 25 U.S.C. § 392 (1988) (alien-ation of allotments subject to approval by the Secretary of the Interior); the Act of May 29, 1908, § 1, 35 Stat. 444, *codified at* 25 U.S.C. § 404 (1988) (sale of allotted lands subject to petition for approval by the Secretary of the Interior).

Finally, the Tribe points to the Act of March 3, 1921, § 1, 41 Stat. 1232, *codified at* 25 U.S.C. § 393 (1988), requiring Secretarial approval for leasing of restricted allotments. Similarly, the Tribe cites the Act of August 9, 1955, § 1, 69 Stat. 539, *codified as amended at* 25 U.S.C. § 415 (1988). By that section, the leasing of restricted Indian lands is permitted only upon the approval of the Secretary of the Interior.

### 2. *The Regulations*

In addition to the statutes set out above, the Tribe relies on an extensive array of regulations governing Indian lands in 25 C.F.R. Parts 150, 151,[15] 152, 162, and 166. 25 C.F.R. Part 150 (1989),[16] entitled "Land Records and Title Documents," sets forth the "authorities, policy and procedures governing the recording, custody, maintenance, use and certification of title documents, and the issuance of title status reports for Indian land." 25 C.F.R. § 150.1. The Tribe places particular emphasis on the purpose of title records as defined in 25 C.F.R. § 150.2(m), which "is to provide evidence of a transaction, event, or happening that affects land titles; to preserve a record of the title document; and to give constructive notice of the ownership and change of ownership and the existence of encumbrances to the land."

The importance of 25 C.F.R. Part 150 lies in the stipulated and obvious fact that the Tribe relies on the BIA at both the Pine

---

**14.** The defendant also cites the Court of Claims decision in *Hydaburg* for the proposition that both § 10 of the IRA, 25 U.S.C. § 470, and the Act of April 11, 1970, 25 U.S.C. § 488, give rise to a creditor-debtor relationship, not a trust relationship creating fiduciary obligations. *See Hydaburg,* 229 Ct.Cl. at 257–258, 667 F.2d at 68. Again, for the reasons explained in note 12, *supra,* whether or not these two statutes create only a debtor-creditor relationship does not alter our conclusion that jurisdiction exists in this case.

**15.** The parties dispute the applicability of 25 C.F.R. Part 151. In view of the standard set

forth in *Mitchell II,* 463 U.S. at 224–227, 103 S.Ct. at 2971–2973, *see infra,* we need not decide the relevance of this Part. All of the other statutes, regulations, and agreements invoked by the Tribe establish that the defendant exercised such elaborate control sufficient to create fiduciary obligations giving rise to money damages.

**16.** The primary statutory authority for 25 C.F.R. Part 150 is contained in 25 U.S.C. §§ 5 and 9. The Tribe invokes both of these statutory provisions in support of its jurisdictional analysis.

Ridge Agency and Aberdeen Land Titles and Records Office for the preparation and processing of deeds, the timely transfer of deals between those two offices, the timely recording of title transfers for purchased lands, and for the recording of title transfers from individual beneficial interest holders to the Tribe. These record transactions are necessary to assure the payment and receipt of lease and permit income generated by certain purchased lands. We also observe, in passing, that 25 C.F.R. Part 150 imposes numerous additional duties on the defendant with respect to the maintenance of land records and title documents, 25 C.F.R. § 150.3, recording, 25 C.F.R. § 150.6, the correction of title defects, 25 C.F.R. § 150.7, title status reports, 25 C.F.R. § 150.8, and land status maps, 25 C.F.R. § 150.9.

The Tribe also embraces 25 C.F.R. Part 152 (1989).[17] That portion of the regulations governing Indian lands, titled "Issuance of Patents in Fee, Certificates of Competency, Removal of Restrictions, and Sale of Certain Indian Lands," addresses various aspects involved in the sale, exchange, and conveyance of trust or restricted lands. Throughout 25 C.F.R. Part 152, it is abundantly evident that every step is again subject to Secretarial approval. For example, the sale, exchange, or conveyance by an individual Indian may be accomplished *only* with approval of the Secretary. 25 C.F.R. § 152.17. Similarly, Secretarial approval is required for the conveyance of individually-owned trust or restricted lands and lands owned by a tribe. 25 C.F.R. § 152.22. 25 C.F.R. § 152.24 states that "[e]xcept as otherwise provided by the Secretary, an appraisal shall be made indicating the fair market value prior to making or approving a sale, exchange, or other transfer of title of trust or restricted land."

Additionally, the Tribe asserts that various provisions of 25 C.F.R. Part 162

(1989),[18] entitled "Leasing and Permitting," have a bearing on the management responsibilities assumed by the defendant in this case. Under 25 C.F.R. § 162.3(4), owners of trust land, such as the Tribe, are authorized to lease lands. That authority, nevertheless, is circumscribed by 25 C.F.R. § 162.5(a), which provides that—"[a]ll leases made pursuant to the regulations in this part shall be in the form approved by the Secretary and subject to his written approval." The Secretary is further directed to approve only those leases that are made at the present fair annual rental. 25 C.F.R. § 162.5(b).

Leases under 25 C.F.R. Part 162 must specify whether rental payments are to be made directly to the owner, or whether payment is to be made to the BIA. 25 C.F.R. § 162.5(f). Under 25 C.F.R. § 162.5(g)(1), all leases must contain a provision stating that "[w]hile the leased premises are in trust or restricted status, all of the lessee's obligations under this lease … are to the United States as well as to the owner of the land." Further, 25 C.F.R. § 162.5(h)(2) explains that—"[w]hile the leased premises are in trust or restricted status, the Secretary may in his discretion suspend direct rental payment provisions of [any] lease [granted or approved on individually-owned lands providing for the direct payment of rent directly to the owner] in which event the rentals shall be paid to the [BIA]." Among other powers granted in this part, the Secretary is also given the authority to limit lease length so as to allow the highest return of rental income consistent with prudent management and conservation practices. 25 C.F.R. § 162.8.

Lastly, the Tribe relies on the "General Grazing Regulations" outlined in 25 C.F.R. Part 166 (1989),[19] which governs both tribal and individually-owned lands. Insofar as

---

**17.** A number of statutes serve as the statutory authority for 25 C.F.R. Part 152, some of which are asserted by the Tribe here, including 25 U.S.C. §§ 378, 379, 404, and 405.

**18.** The Tribe asserts a variety of the statutes that authorize 25 C.F.R. Part 162, including 25 U.S.C. §§ 2, 9, 393, 415, and 477.

**19.** The statutory authority for 25 C.F.R. Part 166 alleged by the Tribe in support of jurisdiction is comprised of 25 U.S.C. §§ 2, 9, 393, 466, and 477.

25 C.F.R. Part 166 implements § 6 of the IRA, 25 U.S.C. § 466, it is indisputable that the regulations contained in that part impose management duties over grazing lands that will support a claim within the jurisdiction of this court. *Hydaburg,* 229 Ct.Cl. at 258, 667 F.2d at 68 (citations omitted). 25 C.F.R. § 166.4. The regulations set out in this part are of paramount importance in this case because the lion's share of the subject land is grazing land. 25 C.F.R. § 166.2 states that "[i]t is the Secretary's responsibility to improve the economic well-being of the Indian people through proper and efficient resource use." At least one objective contemplated by this part of the regulations is to: "Provide for the administration of grazing privileges in a manner which will yield the highest return consistent with sustained yield land management principles and the fulfillment of the rights and objectives of tribal governing bodies and individual land owners." 25 C.F.R. § 166.3(c). The defendant is responsible for consolidating individual and tribe ownerships in range areas into "management units" for the "conservation, development, and effective utilization of the range resource[s] ... in a manner which will best meet the requirements of Indian needs, land ownership status, and proper land use" under 25 C.F.R. § 166.5. It is responsible for prescribing the amount of livestock to be grazed on each range unit, taking into consideration tribal "objectives [such as those specified in 25 C.F.R. § 166.3(c), *see supra* ]" under 25 C.F.R. § 166.6. Thus, because the effective utilization of range units requires the consolidation of large tracts of land, Indian governing bodies may issue range grazing permits for tribally-owned lands only with the approval of the defendant under 25 C.F.R. § 166.7.

Similarly, all grazing permits range units containing tribal and individually-owned lands are issued *solely* by the defendant. 25 C.F.R. § 166.7. The BIA is, under 25 C.F.R. § 166.9, given broad authority for the inclusion of grazing permits on range units. Grazing capacity on tribal land is determined by the BIA, 25 C.F.R. § 166.12(a). While the determination of minimum rental rates is vested in tribal governments, the value upon which those determinations are based are premised on BIA approval of the value of grazing on tribal lands. 25 C.F.R. § 166.13(a). The BIA is further charged with the responsibility of establishing the minimum acceptable grazing rental rates for the reservation. 25 C.F.R. § 166.13(b). The duration of grazing permits in excess of five years is subject to the review of the BIA under 25 C.F.R. § 166.14(c). Grazing permits cannot be transferred or assigned without BIA approval, 25 C.F.R. § 166.15(a). Moreover, the BIA is charged with the authority to police compliance under 25 C.F.R. § 166.15(b), and thus it may revoke or withdraw all or any part of a grazing permit for cause.

All grazing permit operations are subject to mandatory provisions that are required by the BIA. 25 C.F.R. § 166.19. As with leasing, 25 C.F.R. § 166.19(a)(1) requires every grazing permit to include a clause stating that "[w]hile the lands covered by the permit are in trust or restricted status, all of the permittees' obligations under the permit ... are to the United States as well as to the owner of the land." Also of significance here is 25 C.F.R. § 166.21, which designates that "[p]ayment [of annual grazing fees] shall be made to the Bureau of Indian Affairs unless otherwise provided by the permit." Finally, we observe that the BIA has promulgated a wide-ranging regulation governing the procedures that must be followed to protect grazing range units in the event of trespass or permit violations on Indian trust, restricted, or government lands. *See* 25 C.F.R. § 166.24.

### 3. The Trust Relationship and Fiduciary Obligations

■ From the foregoing statutes and regulations, we think the Tribe has established that the defendant exercises such pervasive authority and elaborate control over tribal land and monies so as to create a trust relationship giving rise to fiduciary obligations for the management of the Tribe's assets at issue here. And, where there is a proven breach of these obli-

gations at trial, the defendant would, of course, be liable for appropriate damages. It is well settled that such facts are sufficient to confer jurisdiction on this court to decide the asset mismanagement claims asserted by the Tribe, and we so find. Our holding is based on the decision of the Supreme Court in *Mitchell II*, 463 U.S. 206, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983).

In *Mitchell II*, the Supreme Court considered whether various timber management statutes and regulations imposed a fiduciary duty on the government to manage timber lands for the economic benefit of the Indians. There, as here, the threshold issue was jurisdictional—whether the substantive law could be fairly interpreted as mandating the payment of compensation for the damages sustained as a result of a breach of those statutory and regulatory duties. *Mitchell II*, 463 U.S. at 218, 103 S.Ct. at 2968. The Supreme Court stated that the government's role in the sale of Indian timber was "pervasive," *Mitchell II*, 463 U.S. at 219, 103 S.Ct. at 2969, and that the government " 'exercise[d] literally daily supervision over the harvesting and management of tribal timber.' " *Mitchell II*, 463 U.S. at 222, 103 S.Ct. at 2971. By an aggregation of the various statutes and regulations implicated in that case, the Supreme Court held that a fiduciary obligation was created by the government's "full responsibility" for the management of Indian resources. *Mitchell II*, 463 U.S. at 224, 103 S.Ct. at 2972. Those fiduciary obligations necessarily arose by virtue of the government's total control over Indian property. *Mitchell II*, 463 U.S. at 225, 103 S.Ct. at 2972. Because these statutory and regulatory duties created fiduciary obligations, they could be fairly interpreted as requiring the payment of money damages. *Mitchell II*, 463 U.S. at 226, 103 S.Ct. at 2973. By deciding that the statutes and regulations required the payment of compensation for breach of fiduciary duties, our predecessor Court of Claims was vested with jurisdiction over the breach of trust claims at issue in that case. *Mitchell II*, 463 U.S. at 228, 103 S.Ct. at 2974.

We think, and hold, that the situation presented by the case at bar is very similar in all material particulars to that in *Mitchell II*. Given that circumstance, we adopt the reasoning employed in *Mitchell II*, particularly the relevant language which we view as controlling here:

[T]he statutes and regulations now before us clearly give the Federal Government full responsibility to manage Indian resources and land for the benefit of the Indians. They thereby establish a fiduciary relationship and define the contours of the United States' fiduciary responsibilities.

\*    \*    \*    \*    \*    \*

[*A*] *fiduciary relationship necessarily arises when the Government assumes such elaborate control over* [*lands and monies belonging to the Tribe*]. All of the necessary elements of a common law trust are present: a trustee (the United States), a beneficiary [the Tribe and the OSTLAE], and a trust corpus [Tribal lands and funds]. "Where the Federal Government takes on or has control or supervision over tribal monies or properties, the fiduciary relationship normally exists with respect to such monies or properties ... even though nothing is said expressly in the authorizing or underlying statute (or other fundamental document) about a trust fund, or a trust or fiduciary connection." [citation omitted].

Our construction of these statutes and regulations is reinforced by the undisputed existence of a general trust relationship between the United States and the Indian people. This court has previously emphasized "the distinctive obligation of trust incumbent upon the Government in its dealings with these dependent and sometimes exploited people." [citations omitted]. This principle has long dominated the Government's dealings with Indians. [citations omitted].

\*    \*    \*    \*    \*    \*

Because the statutes and regulations at issue in this case clearly establish fiduciary obligations of the Government in the management and operation of Indi-

an lands and resources, they can fairly be interpreted as mandating compensation by the Federal Government for damages sustained. Given the existence of a trust relationship, it naturally follows that the Government should be liable in damages for the breach of its fiduciary duties. It is well established that a trustee is accountable in damages for breaches of trust. [citations omitted]. This Court ... [has] consistently recognized that the existence of a trust relationship between the United States and an Indian or Indian tribe includes as a fundamental incident the right of an injured beneficiary to sue the trustee for damages resulting from a breach of the trust. [footnote citations omitted].

· The recognition of a damages remedy also furthers the purpose of the statutes and regulations, which [in our view] clearly require that the Secretary manage [or assist and aid in the management of] Indian resources so as to generate proceeds for [the Tribe]. It would be anomalous to conclude that these enactments create a right to the value of certain resources when the Secretary lives up to his duties [to manage or assist in the management of Tribal lands and funds], but no right to the value of the resources if the Secretary's duties are not [properly] performed.

*Mitchell II*, 463 U.S. at 224–227, 103 S.Ct. at 2971–2973.

In our view, these passages are squarely on point with the jurisdictional factual circumstances in the case at bar. They leave nothing to be said in addition. We find, therefore, that through the statutes and regulations cited above, the BIA did in fact establish an "elaborate" system of control over the management of Tribal lands for the purpose of producing income from those lands in sufficient amounts for the Tribe, at the very least, to repay its loan obligations to the FmHA. The pervasive amount of BIA statutory and regulatory control over, and involvement in, Tribal decisions relating to land sales, land purchases, land leasings, and range permitting, not to mention its duties with respect to land records and title documents, is similarly

designed with the intent of establishing a system of BIA oversight to ensure proper land management that will, in turn, generate an appropriate level of income from Tribal lands. In that sense, such control is clearly intended to confer economic benefits on the Tribe and other Indians.

Moreover, the authority and effect of the BIA control over leasing and permitting is comparable to the situation addressed by the Court of Appeals for the Federal Circuit (CAFC) in *Pawnee v. United States*, 830 F.2d 187 (Fed.Cir.1987), *cert. denied*, 486 U.S. 1032, 108 S.Ct. 2014, 100 L.Ed.2d 602 (1988). There the issue was—whether the Indian Long–Term Leasing Act, 25 U.S.C. § 396, and the Federal Oil and Gas Royalty Management Act, 30 U.S.C. §§ 1701–1757, along with the implementing regulations of the latter Act, granted such pervasive authority over the leasing of Indian mineral lands that they created fiduciary obligations. The CAFC held that the government did indeed have a fiduciary obligation with respect to the management of those leases, and observed that:

[T]he Secretary of the Interior [is] at the center of leasing of Indian mineral lands. He determines whether to consent to a lease and the terms of the lease; he performs "any and all acts" necessary to carry ... the [Long–Term Leasing Act, 25 U.S.C. § 396] "into full force and effect"; and he makes such rules and regulations as may be necessary to carry out the legislation. [footnote citations omitted].

\*  \*  \*  \*  \*  \*

[The implementing regulations for the Federal Oil and Gas Royalty Management Act, 30 U.S.C. §§ 1701–1757 governing the BIA] deal expressly, *inter alia*, with the maximum royalty rent, minimum rentals and royalties rate, length of the lease, [and the] methods of payment of rentals and royalties. [citations omitted].

\*  \*  \*  \*  \*  \*

[The fiduciary obligations established by the] governing statutes and regulations (a) give elaborate powers to Interior with

respect to those leases, (b) always call for consideration of the best interest of the Indians, (c) require proceeds of the leases to be given to the Indians and, (d) recognize the existence of a general trust relationship toward the Indians with respect to the oil and gas products of these lands.

*Pawnee,* 830 F.2d at 189–190.[20]

This passage is again on all fours with respect to the quantum of control exercised by the BIA under the regulations governing the leasing and permitting of Indian land, *see* 25 C.F.R. Part 162, and grazing on Indian land, *see* 25 C.F.R. Part 166. Both sets of regulations give broad and elaborate powers to the BIA. More importantly, they always call for the BIA to consider the best interests of the Tribe. *See, e.g.,* 25 C.F.R. § 166.3(b), (c); *see generally* 25 C.F.R. Part 162 (extensive Secretarial control over leasing to protect and conserve Indian lands). The proceeds from leasing, permitting, and grazing activities would go to the Tribe, of course, were it not for the fact that some of this income is pledged to the FmHA for the repayment of loan obligations. Finally, we think it is implicit that the regulations recognize, at the very least, the existence of a general trust relationship toward the Tribe with respect to those lands that are subject to leasing, permitting, or grazing.

4. *The 1976 and 1983 Memoranda of Understanding Bolster The Existence of A Trust Relationship and Fiduciary Obligations*

The case before us contains yet another element which bolsters our conclusion that there was and is a trust relationship that imposes fiduciary obligations on the defendant for the management of the Tribal assets in the subject case. Namely, we observe that the statutory and regulatory duties imposed on the BIA were further refined and solidified, in many respects, by the 1976 and 1983 Memoranda of Under-

standing. Said memoranda were executed at the insistence of the FmHA, which required the Tribe and the BIA to sharply delineate their respective duties by implementing a plan "for the maintenance of land records and the collection of revenues of the OSTLAE" prior to any FmHA approval of the Tribe's loan requests.

██ Thus, it is indisputable that the MOU is that "other fundamental document" which "particularized in detail the agreement [between the Tribe, the BIA, and the FmHA]" with respect to which the Supreme Court has recognized as creating by implication a fiduciary relationship. *Mitchell II,* 463 U.S. at 225, 103 S.Ct. at 2972. As a consequence of the execution of the MOUs, the BIA assumed, *inter alia,* specific duties relating to the maintenance of records for all land held in trust by the United States, the collection of revenues from Tribal lands, the maintenance of records for land acquired under the OSTLAE, and the collection of income from the OSTLAE lands, 1976 and 1983 MOUs § 1.1. The BIA also assumed responsibility for the deposit and maintenance of Tribal funds in the U.S. Treasury, 1976 and 1983 MOUs §§ 3.3 and 3.5, as well as the duty to invest a portion of those funds at the highest interest rate available, 1976 and 1983 MOUs § 3.7. The Tribe agreed to prepare annual budgets, which were to allocate assigned income in a manner sufficient to ensure the proper debt service of FmHA loans. From these memoranda agreements, it is patently evident that the Tribe surrendered to the BIA its rights to lease its lands, issue permits, to collect rental income, and to apply that income in any manner that would otherwise have been authorized by law and regulation. Concomitantly, the BIA assumed these duties, in addition to the responsibility for maintaining such records as would be necessary to fulfill those obligations.[21]

---

**20.** While *Pawnee* recognized the existence of a trust relationship giving rise to fiduciary obligations, the claim asserted by the Indians in that case was rejected because it did not assert a proper claim within the scope of the fiduciary relationship established by the statutes and reg-

ulations. *Pawnee,* 830 F.2d at 191–192. That is not the problem at issue in the case at bar.

**21.** The Tribe also asserts that the 1976 and 1983 MOUs constitute contracts, thereby alleging that, to the extent that the BIA failed to fulfill its

We think, therefore, that these MOUs demonstrate and corroborate, beyond any measure of doubt, that a trust relationship was created whereby the defendant undertook fiduciary obligations to manage, to a significant degree, Tribal lands, records, and monies. *See Navajo Tribe of Indians v. United States*, 224 Ct.Cl. 171, 184, 624 F.2d 981, 987 (1980). The pervasive role of the BIA in record maintenance, income collection, Treasury fund maintenance, land purchase approval, land sale approval, land leasing, the issuance of range permits, and the supervision of grazing on Tribal lands, taken together lead inexorably to such a conclusion. The Tribe's management authority over the subject land and funds has been effectively reduced to a perfunctory role—making only general policy decisions on the lands it wishes to purchase, how much it is willing to spend, and whether to borrow additional funds for those purchases. All of these powers, however, are subordinate to the various powers of the defendant. The record is clear that the entire system is premised on *BIA's approval* over all of the authority purportedly exercised by the Tribe.

In sum then, we find that here fiduciary obligations were created and imposed on the BIA, the breach of which will, if proven, entitle the Tribe to money damages. We therefore hold that this court has jurisdiction over the asset mismanagement claims asserted by the Tribe.[22]

## B. *The Alternative Motion For Partial Summary Judgment*

We now turn to the defendant's alternative motion for partial summary judgment. As we have previously noted, defendant argues that one of the allegations raised by the Tribe—whether the defendant has an obligation to maximize the income derived from Tribal assets—is not a claim upon which relief can be granted. The defendant relies primarily upon *Navajo Tribe v. United States*, 9 Cl.Ct. 336, 412 (1986), for the proposition that there is no such obligation. In contrast, the Tribe relies primarily upon *Cheyenne Arapaho Tribes of Indians v. United States*, 206 Ct.Cl. 340, 348–349, 512 F.2d 1390, 1394 (1975), to support its allegation that the defendant had a duty to maximize income through the prudent management of Tribal assets and to account for the best interests of the Tribe. In addition, the Tribe asserts that this duty, which is akin to a fiduciary obligation, is both express and implied in the regulations, specifically 25 C.F.R. Parts 162 and 166.

The standard by which we must address this alternative cross-motion is set out in RUSCC 56(c): "The judgment sought shall be rendered forthwith if ... there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." However, "[e]ven where summary judgment criteria appear to be satisfied ... '[a] Court may deny [partial] summary judgment as a mat-

responsibilities under those agreements, this court has breach of contract jurisdiction under 28 U.S.C. § 1491(a)(1). While the memoranda bear a striking resemblance to express contracts, we do not decide the issue at this time in view of the overwhelming indicia of fiduciary obligations imposed on the defendant by these documents, the statutes, and the regulations. Nevertheless, we observe that, in the defendant's view, a breach of contract claim is insufficient for jurisdictional purposes under 28 U.S.C. § 1491(a)(1) *in the absence of some additional substantive constitutional, statutory, or regulatory right to money damages. See* Defendant's Reply Brief, at p. 14. Thus, it argues that, even if the MOUs are contracts, a breach would not confer any right to money damages. Such an assertion, we find, is shocking, insofar as it is a *gross* misstatement of the law. Clearly, *Mitchell II* does *not* require a petitioner to demonstrate a constitutional, statutory, or regulatory right to money damages for a proven breach of contract claim. The substantive right to compensation is in the contract itself, insofar as a petitioner would necessarily be entitled to money damages for any breach of contractual obligations.

22. Against such a background, Congress has emphasized that "[i]f we fail [to permit Indians to call government agencies to account on obligations assumed by the federal government] by denying access to the courts when trust funds have been improperly dissipated or other fiduciary duties have been violated, we compromise the national honor of the United States." H.R. Rep. No. 1466, 79th Cong., 1st Sess., 5 (1945), *quoted in Mitchell II*, 463 U.S. at 215, 103 S.Ct. at 2967.

ter of [judicial] discretion.'" *Toyoshima Corporation of California v. General Footwear, Inc., U.S.*, 88 F.R.D. 559, 560 (S.D.N.Y.1980) (quotation omitted). That is to say, "[a] court, in its discretion in shaping the case for trial, may deny [partial] summary judgment as to portions of the case that [may be] ripe therefor, for the purpose of achieving a more orderly or expeditious handling of the entire litigation." 6 J. Moore, Federal Practice, ¶ 56.15[6], at 2427; *cited in Confederated Tribes of the Colville Reservation v. United States*, 20 Cl.Ct. 31, 38 n. 14 (1990). *See also Powell v. Radkins*, 506 F.2d 763, 765 (5th Cir.1975). Judicial discretion may be exercised in the denial of a motion for partial summary judgment when the resolution of that particular issue is inextricably intertwined with additional claims that must be decided at trial. "[P]artial summary judgment is properly withheld where ... a considerable expenditure of judicial time and effort will be required 'to sift out and piece together the undisputed facts essential to a summary judgment.'" *Toyoshima*, 88 F.R.D. at 560 (quotation omitted).

On these bases, therefore, we decline to rule on the defendant's motion for partial summary judgment. To decide the question posed by the defendant's motion would, in our view, be an inefficient use of judicial resources. The claim on which the defendant seeks dismissal is not a discrete claim for relief, but rather it is part of a general and larger claim by the Tribe, wherein it is alleged that the defendant mismanaged Tribal assets. We cannot justify separating that claim from the general breach assertions that can be more easily disposed of along with all other issues at the ensuing trial. Our refusal to act on the defendant's alternative motion is particularly appropriate in light of the difficult issues of Indian land law involved here. It is clear that our duty is discharged best "in a case of this complexity only by trial, findings, and judgment in regular course." *Arenas v. United States*, 322 U.S. 419, 434, 64 S.Ct. 1090, 1096, 88 L.Ed. 1363 (1944), *quoted in Confederated Tribes*, 20 Cl.Ct. at 38, n. 14.

## CONCLUSION

The statutes, regulations, and Memoranda of Understanding at issue in this case create a trust relationship that imposes fiduciary obligations on the defendant for the management of Tribal assets. This being true, we find that a breach of those duties, if established, would mandate the payment of money damages. Consequently, the defendant's motion to dismiss is DENIED. Concomitantly, the Tribe's cross-motion for partial summary judgment is GRANTED, but *only* to the extent that we have found that the substantive law at issue establishes fiduciary obligations on the defendant. Finally, the defendant's alternative cross-motion for partial summary judgment is DENIED as an inefficient use of judicial resources.

Pursuant to RUSCC Appendix G, the following pretrial order is hereby established:

1. Discovery by both parties shall be completed on or before October 26, 1990.

2. The meeting of counsel called for by paragraph 10 of Section V of Appendix G shall be held by November 23, 1990.

3. The memoranda and motion called for by paragraphs 11–17 of Section V of Appendix G shall be filed on or before January 23, 1991.

4. The pretrial conference shall be held on January 30, 1991, at 10:00 a.m., at the National Courts Building, 717 Madison Place, N.W., Washington, D.C. 20005. The exact courtroom location will be posted in the lobby at that time. A trial date will be set at that time.

IT IS SO ORDERED.