**64**

HYDABURG COOPERATIVE ASSOCIA-
TION and Virginia Morrison, for herself
and for all others similarly situated,

v.

The UNITED STATES

Nos. 434–76, 297–79L.

United States Court of Claims.

Dec. 16, 1981.

Drew Peterson, Anchorage, Alaska, for plaintiffs; Charles Cooper Geraty, III, atty. of record. Alaska Legal Services Corp., Anchorage, Alaska, Bruce Davies, and Native American Rights Fund, Boulder, Colo., of counsel.

Ezra D. Rosenberg, Washington, D.C., with whom was Asst. Atty. Gen. James W. Moorman, Washington, D.C., for defendant.

Before SKELTON, Senior Judge, and KASHIWA and BENNETT, Judges.

## ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND PLAINTIFFS' ALTERNATIVE MOTIONS, INCLUDING MOTION FOR PARTIAL SUMMARY JUDGMENT

KASHIWA, Judge:

This case is before the court on defendant's motion for summary judgment and on various motions by plaintiffs, including one for partial summary judgment. After hearing oral argument and fully considering the parties' submissions, we allow defendant summary judgment.

During the late 1940's and early 1950's, the community associations of certain southeastern Alaska communities purchased local salmon fleets and canneries. Plaintiff Hydaburg Cooperative Association (HCA) was the community association which owned and operated the canning enterprise in Hydaburg, Alaska. Other named plaintiffs are members of HCA.

HCA is a chartered Indian corporation within the meaning of section 17 of the Indian Reorganization Act of 1934, ch. 576, 48 Stat. 984 (1934) (Act), presently codified at 25 U.S.C. §§ 461 et seq. (1976). Accordingly, HCA was eligible to receive, and in fact did receive, financing for the cannery's acquisition and operation through the revolving loan fund established by section 10 of the Act. The Bureau of Indian Affairs (BIA), Department of the Interior, administers the revolving loan fund.

The Hydaburg cannery was initially profitable, but during the 1950's, huge annual losses were incurred. HCA borrowed repeatedly from the section 10 fund to finance and refinance these losses. Between 1955 and 1959, the Hydaburg cannery and a similar Indian-owned cannery at Klawock were consolidated and only one cannery operated each season to reduce costs.

In March 1959, a new loan agreement was entered in a major restructuring of HCA's debt. That agreement incorporated the regulations contained in 25 C.F.R. Part 91 (1958) or subsequent versions and identified "all net assets" and "all income" of HCA as security for the loan. Nine modifications to this agreement, usually associated with HCA requests for additional loans, were entered by the parties. One such modification gave BIA the authority to approve all contracts for the management of the HCA cannery. Thereafter in March 1963 with BIA approval, HCA entered a management contract with F. J. Gunderson. The financial plight of the cannery worsened, however. During the 21 seasons between 1944 and 1965, the cannery had operating losses aggregating $1,104,047. By early 1965, HCA's total indebtedness, $1,373,640, exceeded the security by almost $413,464.

HCA had apparently been told during spring 1964 that if the 1964–1965 season was a loss, additional financing would not be available from the section 10 fund. An additional loss of $119,567 was incurred that season. Anticipating that loss, the BIA evaluated between November 1964 and March 1965 the available alternatives. It was eventually determined that the Hydaburg and Klawock canneries should again be consolidated, at least for the 1965–1966 season, as economics justified only one operation. For various reasons, the Klawock cannery was selected. On March 19, 1965, the BIA sent Modification 10 of the 1959 loan agreement for HCA approval. Modification 10 recited HCA's substantial indebtedness to the Government and detailed the consolidation plans. Also on March 19, the BIA terminated F. J. Gunderson's contract to manage the HCA cannery.

HCA, wishing joint operations in Hydaburg, refused to approve Modification 10. HCA was told during subsequent negotiations that a default on the 1959 loan agreement would be declared if the modification was not approved as HCA would become delinquent as of March 31, 1965, in the payment of $19,134.05 in principal and $63,-931.48 in interest. HCA refused to alter its position and on April 16, 1965, BIA declared the loan in default. The BIA thereafter approved Modification 10 for HCA. Joint operations ensued. HCA sought administrative review of the events leading to the default. Following hearings by the Department of the Interior, a report was issued critical of the manner in which the Klawock cannery was chosen over Hydaburg's. The report concluded, however, as had the BIA, that continued operations at both canneries could not be justified.

Joint operation with and at Klawock continued until 1969, although HCA continued to demand closing of the Klawock operation and transfer of the joint operation to Hydaburg. Faced with substantial start-up costs at Hydaburg and with the overlap of maintenance costs between the facilities, the BIA declined. In 1970, the Hydaburg cannery was leased to private concerns. When that enterprise showed no profit, the lease was terminated. In 1973, the cannery was leased to a second private concern. That lease will expire in 1984. The bulk of the present rent is paid to the BIA as service on HCA's debt, although a small portion is paid as profit directly to HCA.

Five of the six counts in the present action were originally filed March 7, 1974, in United States District Court but were transferred here in 1979 pursuant to 28 U.S.C. § 1406(c) after the district court concluded it lacked subject matter jurisdiction. The sixth count was added by amended petition in February 1980. These cross motions eventually followed.

We summarize plaintiffs' arguments briefly. Count I alleges that defendant interfered with the contractual relationship existing between HCA and its cannery manager, resulting in HCA's inability to avoid default. Count II alleges that defendant breached its trust obligations based on the interference with the contractual relationship between HCA and its cannery manager. Count III alleges that defendant breached its trust duties by failing to make the cannery productive, that defendant breached its statutory duties by failing to manage HCA's property in a manner that would promote the economic development of HCA, and that defendant breached its contractual duty to liquidate or operate, or arrange for the operation of, the HCA cannery. Count IV seeks class action relief for the actions of defendant alleged in Counts I and III. Count V alleges that defendant breached its trust duties by failing to prevent the transfer of assets from the Hydaburg cannery to the Klawock cannery. Count VI alleges that defendant breached its trust duties by failing to protect, preserve, maintain, repair, and insure the cannery.

Defendant's primary analysis is that this court lacks jurisdiction to consider any of plaintiffs' claims. Plaintiffs counter that considerable deference should be given to the district court's determination that the Court of Claims does have jurisdiction. As jurisdiction is proper in this court, plaintiffs continue, similar weight should be given to several interlocutory pronouncements by the district court prior to the 28 U.S.C. § 1406(c) transfer.

▮ It is well settled, however, that this court may evaluate its jurisdiction at any time, notwithstanding what other courts, in dicta or otherwise, may have suggested. *See Aetna Casualty & Surety Co. v. United States*, 228 Ct.Cl. ——, ——, 655 F.2d 1047, 1051 (1981). Similarly, when a suit is dismissed for lack of jurisdiction, rulings on the merits rendered prior to the dismissal are nullities, void *ab initio*. Such rulings are entitled to no weight either as precedent or as law of the case. *See Alabama Hospital Association v. United States*, 228 Ct.Cl. ——, ——, 656 F.2d 606, 610, (1981), *cert. denied*, —— U.S. ——, 102 S.Ct. 2006, —— L.Ed.2d —— (1982), and cases cited thereat. We turn, therefore, to the jurisdictional theories plaintiffs assert.

## A. Trust Theories

Plaintiffs' major contention is that the United States has breached trust duties imposed on it by the Indian Reorganization Act. In the present case, the genesis for plaintiffs' trust theories is apparently section 5 of the Act, 25 U.S.C. § 465. In relevant part, that section provides:

SEC. 5. The Secretary of the Interior is hereby authorized, in his discretion, to acquire through purchase, relinquishment, gift, exchange, or assignment, any interest in lands, water rights or surface rights to lands, within or without existing reservations, including trust or otherwise restricted allotments whether the allottee be living or deceased, for the purpose of providing land for Indians.

\* \* \* \* \* \*

The unexpended balances of any appropriations made pursuant to this section shall remain available until expended.

*Title to any lands or rights acquired pursuant to this Act shall be taken in the name of the United States in trust for the Indian tribe or individual Indian for which the land is acquired,* and such lands or rights shall be exempt from State and local taxation. [Emphasis supplied.]

Section 5, argue the plaintiffs, creates a fiduciary obligation in the United States to promote, manage, and maintain all assets and enterprises acquired by Indians pursuant to the Act.

The relevant inquiry, of course, is the scope of the fiduciary relationship intended by Congress through the Act. *See United States v. Mitchell,* 445 U.S. 535, 100 S.Ct. 1349, 63 L.Ed.2d 607 (1980) (*Mitchell*). The *Mitchell* plaintiffs had alleged that the General Allotment Act of 1887, ch. 119, 24 Stat. 388 (1887), presently 25 U.S.C. §§ 331 *et seq.*, placed certain Indian lands in trust and thereby imposed fiduciary responsibilities as to the management of allotted timber lands. After reviewing the statute and legislative history of that Act, the Court rejected the *Mitchell* plaintiffs' analysis. Although section 5 of the General Allotment Act did indicate the Indian lands were to be held "in trust," the Court concluded that Congress had intended "only a limited trust relationship \* \* \* that does not impose any duty upon the Government to manage timber resources." *Mitchell,* 445 U.S. at 542, 100 S.Ct. at 1354. Thus, as our previous cases have recognized, the use or absence of the term "trust" is not controlling. *See, e.g., Duncan v. United States,* 229 Ct.Cl. ——, ——, 667 F.2d 36, 41–42 (1981), and cases cited thereat. With the admonitions of *Mitchell* in mind, we turn to the present case.

As in the General Allotment Act, section 5 of the Indian Reorganization Act does speak of a trust relationship. Carefully read, however, the statutory language discloses that the trust extends only to ownership of, or rights in, real property acquired *by the United States* pursuant to the Act. This limited scope is confirmed by the legislative history. As discussed in floor debates and in the committee reports, previous Indian acts, specifically the General Allotment Act of 1887, *supra*, had wholly failed to ensure land adequate for the Indians' needs. Numerous Indians had been allotted land only to sell those holdings to whites. Large numbers of Indians had become landless. *See, e.g.,* S.Rep. No. 1080, 73d Cong., 2d Sess. 1–2; 78 Cong.Rec. 11727–11730 (1934) (remarks of Rep. Howard). Representative Howard, a leading proponent of what would become the Act, stressed during floor debates the necessity for restrictions on continued alienation:

In order to protect the economic future of the Indians and to protect the Government itself against the loss and disintegration of the Indian property, it is most essential to prevent alienation of Indian lands outside of Indian ownership. \* \* \* [78 Cong.Rec. 11730 (1934).]

Thus, section 4 of the Act, 25 U.S.C. § 464, restricted the alienation of Indian lands. And section 5, 25 U.S.C. § 465, was included to allow the purchase and holding of new lands:

To meet the needs of landless Indians and of Indian individuals and tribes whose land holdings are insufficient for self-support, section 5 of the bill autho-

rizes the purchase of lands by the Secretary of the Interior, title to be vested in the United States in trust for the Indian tribe for which the land is acquired. There is authorized to be appropriated not to exceed $2,000,000 in any one fiscal year for such purchase of land. [S.Rep. No. 1080, 73d Cong., 2d Sess. 2.]

It follows, we think, that the "trust" established by section 5 of the Act imposes only a duty on the United States to hold the acquired Indian lands so as to prevent continued alienation. *Cf. Mitchell*, 445 U.S. at 543–544, 100 S.Ct. at 1354–1355 (the trust imposed by section 5 of the General Allotment Act, 25 U.S.C. § 348, was intended to prevent alienation of Indian lands and imposes no fiduciary duty to manage timber). Section 5 does not itself "unambiguously impose" a fiduciary duty on the United States to promote all assets or enterprises acquired *by the Indians* pursuant to the Indian Reorganization Act. *See id.* at 542.

Plaintiffs, however, urge us to read section 5 broadly in light of other Act provisions, *e.g.*, section 10 and section 6, which purportedly demonstrate Congressional concern for the Indians' economic well-being. That concern, say the plaintiffs, requires imposition of the contended-for fiduciary relationship over assets and enterprises the Indians have acquired pursuant to the Act.

■ Section 10, 25 U.S.C. § 470, establishes the revolving loan fund. That section provides:

SEC. 10. There is hereby authorized to be appropriated, out of any funds in the Treasury not otherwise appropriated, the sum of $10,000,000 to be established as a revolving fund from which the Secretary of the Interior, under such rules and regulations as he may prescribe, may make loans to Indian chartered corporations for the purpose of promoting the economic development of such tribes and of their members, and may defray the expenses of administering such loans. Repayment of amounts loaned under this authorization shall be credited to the revolving fund and shall be available for the purposes for which the fund is established. A report shall be made annually to Congress of transactions under this authorization.

There is no indication within section 10 itself or the accompanying legislative history that Congress intended a fiduciary relationship benefiting those who borrowed from the fund. Indeed, both the statute and its legislative history suggest loan transactions under section 10 found a relationship more nearly akin to the *commercial* relationship existing between a creditor and debtor. *See* S.Rep. No. 1080, *supra* at 3; 78 Cong.Rec., *supra* at 11730–11731, 11732. Nothing we find in section 10 imposes a fiduciary obligation on the United States to promote the commercial success of borrowing Indians. Similarly, nothing in section 10 imposes a fiduciary duty on the United States to ensure assets and enterprises acquired by the Indians pursuant to the Act will continue to operate. We so hold.

■ Section 6, 25 U.S.C. § 466, delineates the manner in which timber and grazing lands held in trust are to be managed. That section provides:

SEC. 6. The Secretary of the Interior is directed to make rules and regulations for the operation and management of Indian forestry units on the principle of sustained-yield management, to restrict the number of livestock grazed on Indian range units to the estimated carrying capacity of such ranges, and to promulgate such other rules and regulations as may be necessary to protect the range from deterioration, to prevent soil erosion, to assure full utilization of the range, and like purposes.

This court has previously recognized that breach of the specific timber management duties detailed in section 6 and supporting regulations may found a claim within our jurisdiction. *See Mitchell v. United States*, 229 Ct.Cl. ——, —— & n. 6, 664 F.2d 265, at 270 & n. 6 (1981). *See also United States v. Anderson*, 625 F.2d 910, 915 (9th Cir. 1980), *cert. denied*, 450 U.S. 920, 101 S.Ct. 1367, 67 L.Ed.2d 347 (1981). Section 6, however, is of no help to the present plaintiffs. The reach of section 6 is carefully set, encompassing only the

management of timber and grazing lands. The statute imposes no management standards with regard to general economic activity or with regard to loans made from the section 10 fund. Congress plainly spelled out management standards for timber and grazing lands and it would be incongruous to conclude that similar standards were intended, but never set out, for general economic activities and section 10 loans. Therefore, we conclude that section 6 mandates none of the fiduciary duties plaintiffs would impose on the sovereign.

Plaintiffs make a variety of additional arguments why imposition of these fiduciary duties on the United States is proper. Those contentions are without merit. We have no doubt that advancing the tragic economic state of the Indians was an underlying purpose of the Act in general and of section 10 in particular. *See* S.Rep. No. 1080, *supra* at 1, 3; 78 Cong. Rec., *supra* at 11726, 11730–11731. It is a far different matter, however, given the broad view of sovereign immunity we must take under *Mitchell, supra,* and its predecessors, to conclude that Congress intended the United States to be liable *as a fiduciary* for the promotion, maintenance, and management of assets and enterprises acquired by the Indians pursuant to the Act. As there is simply no indication Congress intended such a fiduciary relationship, and indeed several contrary indications, it follows that the breach of trust claims asserted in Counts II, III, IV, V, and VI must be dismissed.

### B. Regulation Theory

■ Plaintiffs also assert defendant breached its own regulations and related contractual provisions by failing to liquidate or operate the cannery after default as allegedly required by 25 C.F.R. § 91.10. Plaintiffs, however, misread the relevant regulation. At the time of default, 25 C.F.R. § 91.10 (1958) provided:

§ 91.10 *Penalties on default.* Unless otherwise provided in the loan agreement, failure on the part of a borrower to conform to the terms of the loan agreement will be deemed grounds *for any one or all of the following steps to be taken by the Commissioner* :

[Subparagraphs (a)–(h) omitted.]

(i) In the case of corporate and tribal enterprises and cooperative associations, to liquidate or operate, or arrange for the operation of the enterprise or association, until its indebtedness is paid or until the Commissioner has received acceptable assurance of its repayment and of compliance with the loan agreement. [Emphasis supplied.]

Subsequent versions, including the present version at 25 C.F.R. § 91.15 (1980), are not materially different.

The emphasized portion makes clear that the BIA may take any or all of the enumerated steps, *including* liquidation or operation of the debtor's enterprises. The regulation, however, simply does not require that any particular option be utilized. Indeed, requiring the BIA to sell unproductive assets immediately might well result in a greater loss to the Indian borrowers than if a more propitious time for sale could be selected. Plaintiffs have no claims founded on the regulation or related contractual provisions.

### C. Other Theories

■ Plaintiffs also offer several theories of recovery based on the events between November 1964 and the April 1965 default. For example, plaintiffs complain in Count I and in a related class action under Count IV that defendant should be liable for its interference with the management contract between HCA and F. J. Gunderson. Similarly, plaintiffs assert the BIA "illegally announced default," improperly took control of the cannery when liquid assets were available, and committed assorted statutory and constitutional violations in the course of default. Even assuming *arguendo* these various claims to be within our 28 U.S.C. § 1491 or 28 U.S.C. § 1505 jurisdiction, plaintiffs' petition alleging these claims was first filed in March 1974. That date is more than 6 years after each of these other actions would have accrued and 28 U.S.C. § 2501 apparently bars the actions now. Plaintiffs' only argument in response is that their dependency on the BIA should toll the

statute of limitations. As we have previously rejected this position, *see Capoeman v. United States*, 194 Ct.Cl. 664, 440 F.2d 1002 *passim* (1971), it follows that these remaining claims are indeed time barred.

Based on the foregoing, we conclude that defendant's motion for summary judgment on each count of plaintiffs' petition should be and is hereby granted. Plaintiffs' motion for partial summary judgment and related motions [1] should be and are hereby denied. The petition is dismissed.

1. Plaintiffs' motion to proceed with a class action and plaintiffs' motion to compel pretrial submission and have the matter set for trial.