BEAR CLAW TRIBE, INC., Plaintiff,

v.

The **UNITED STATES** of
America, Defendant.

**Congressional Reference No. 92–719X.**

United States Court of Federal Claims.

July 12, 1996.

---

Benjamin R. Graybill, Great Falls, Montana, for plaintiff.

Thornton Withers Field, Department of Justice, Washington, D.C., for defendant. David Moran, Department of the Interior, of counsel.

## REPORT OF THE HEARING OFFICER

FUTEY, Hearing Officer:

This congressional reference case is before the hearing officer on defendant's motion for summary judgment. Plaintiff, Bear Claw Tribe, Inc., alleges that defendant, United States, failed in its duty to hold a particular parcel of real property for plaintiff's benefit. Defendant argues that the statute of limitations bars any legal claim. Further, defendant asserts that plaintiff has no valid legal or equitable claim because defendant was under no general duty to refrain from selling the land. Defendant also contends that it owed no duty to plaintiff in particular. For these reasons, defendant concludes that there is no genuine issue of material fact regarding these matters and that defendant is entitled to judgment as a matter of law. Plaintiff opposes defendant's motion, asserting that issues of fact require ventilation at trial.

### Factual Background

By the 1930's many landless Indians lived in poor conditions around the outskirts of Great Falls Montana, including the Indians that would eventually become the Bear Claw Tribe. In 1933, Congress enacted the National Industrial Recovery Act, designed in part to provide relief for those living in industrial regions by establishing subsistence homesteads:

SUBSISTENCE HOMESTEADS

SEC. 208. To provide for aiding the redistribution of the overbalance of population in industrial centers $25,000,000 is hereby made available to the President, to be used by him through such agencies as he may

establish and under such regulations as he may make, for making loans for and otherwise aiding in the purchase of subsistence homesteads. The moneys collected as repayment of said loans shall constitute a revolving fund to be administered as directed by the President for the purposes of this section.

48 Stat. 200, 206 (1933).

On July 21, 1933, the President signed Executive Order number 6209, authorizing the Secretary of the Interior (Secretary) to act on behalf of the President in administering the subsistence homestead program. Pursuant to this authority, the Secretary began transferring $400,000 from the $25 million allotment to the Department of the Interior's newly created Indian Subsistence Homestead Authority.[1] On October 6, 1934, the Commissioner of Indian Affairs (Commissioner), the sole authority in the Indian Subsistence Homestead Authority, recommended the purchase of a subsistence homestead colony at Great Falls, Montana. In his recommendation letter to the Secretary, the Commissioner described the beneficiaries of this land as "thirty Indian families now living in the crudest kind of shacks on the outskirts of the City of Great Falls, on private land."[2] The Commissioner envisioned providing enough land per family for housing, gardening, and raising small farm animals. The Secretary approved the recommendation.

On February 13, 1935, defendant purchased the land which became known as the "Great Falls Subsistence Homestead" (Homestead). A neighboring community, however, objected to the use of that land as a subsistence homestead and began to circulate petitions in protest. As a result, plaintiff did not construct permanent homes on the Homestead. Development of the project was further stalled as the Supreme Court began declaring various portions of the National Industrial Recovery Act unconstitutional. See, e.g., A.L.A. Schechter Poultry Corp. v. United States, 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570 (1935) (concerning the provision authorizing the President to approve codes of fair competition for a trade or industry); Panama Refining Co. v. Ryan, 293 U.S. 388, 55 S.Ct. 241, 79 L.Ed. 446 (1935) (addressing the provision granting the President discretion to prohibit interstate and foreign commerce of petroleum products). At that point, responsibility for the Homestead's development shifted to the Resettlement Administration. Ultimately, however, the Department of the Interior regained control of the Homestead project through the President's Executive Order of February 1, 1937.[3] Nevertheless, by September of 1941, the Homestead had still not developed any further, as demonstrated by a letter written by Assistant Commissioner of Indian Affairs William Zimmerman to Emmett McNeilly, the superintendent of Rocky Boy's Indian Reservation in North Central Montana:

In 1935, this Office was prepared to go ahead with a subsistence homestead project at Great Falls for the benefit of the thirty odd Indian families who were then living and are still living on Hill No. 57. At that time we had allotted approximately $48,000 to the project. We took the first step by buying an excellent piece of irrigated land just three miles from the city post office. This land is still owned by the United States and could be used for the purpose for which it was purchased. Unfortunately, we should probably have difficulty in diverting to this project enough funds to take care of all the needy families but we could certainly divert five or ten thousand dollars this year, enough to make a start. I believe that the Governor may bring some pressure upon the local people to remove all opposition to our project. In that event, if we are assured of full support and cooperation of the local officials, we should be able to clean up this sore spot.[4]

Apparently the Assistant Commissioner's statements had little effect, for in July of 1950, a House Committee reported that no

---

1. App. to Pl.Resp. to Def.Mot. for Summ.J. at 27–28 (Fed.Cl. Jun. 1, 1995) (containing an order entered by the Secretary of the Interior on September 26, 1934) (hereinafter Pl.App.).

2. Id. at 35.

3. Id. at 52–53.

4. Pl.App. at 54.

further action had ever been taken beyond the mere purchase of the Homestead.[5] Furthermore, the House report stated that the reasons for the lack of development were the opposition from nearby residents and the Indians' objections to occupying the land.[6] In addition, the report noted that there were no future plans for Indian occupancy and that the Indians had never used the Homestead.[7] As a result, Congress authorized the sale of the Homestead on August 18, 1950.[8] The Department of the Interior published a notice of sale on September 28, 1951.[9] Congress completed the sale of the Homestead in 1952 [10] and used the proceeds to buy land for the Rocky Boy's Reservation.[11]

Plaintiff comprises a group of Indians who lived on "Hill 57" on the outskirts of Great Falls, Montana, from the 1920's through the 1980's. Although plaintiff is not a federally recognized tribe, it is registered as a Montana corporation. Plaintiff's tribal elders recall that defendant purchased the Homestead specifically for the Indians that would eventually become the Bear Claw Tribe. While plaintiff's members refrained from occupying or building permanent structures on the land, plaintiff's members nevertheless used the Homestead for camping and religious ceremonies. One of plaintiff's current leaders, Charles Walking Child, learned of the Homestead and, in 1988, began investigating the status of the Homestead. By 1991, he discovered Congress' sale of the Homestead. Through the assistance of the United States Representative from Montana, Pat Williams, plaintiff began the congressional reference process. The resulting bill for relief, H.R. 5784, states in pertinent part:

**A BILL**

For the Relief of the Bear Claw Tribe, Incorporated.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,*

SECTION 1. PAYMENT OF CLAIM

(a) IN GENERAL.—The Secretary of the Treasury shall pay, out of any money in the Treasury not otherwise appropriated, to Bear Claw Tribe, Incorporated, a Montana public benefit corporation, an amount in compensation for any damages arising out of the sale by the United States of the tract of land known as the Great Falls Subsistence Homestead and described in the Act of August 18, 1950 (Chapter 753; 64 Stat 463) that were incurred by—

> (1) Bear Claw Tribe (without regard to whether the damages were incurred before or after the incorporation of the tribe); or

> (2) any current or former member of Bear Claw Tribe, Incorporated, or its predecessor tribes.[12]

The House of Representatives referred this case to the Court of Federal Claims on June 17, 1992.[13] Plaintiff filed its complaint on January 19, 1993. In addition to plaintiff's general claim that defendant breached a fiduciary duty by selling the Homestead, plaintiff raises four other counts that turn on this breach of duty.[14] First, plaintiff asserts that if defendant was required to hold the Homestead, defendant is liable under a negligence theory for selling the land. Second,

---

5. *Id.* at 55–56 (consisting of a committee report accompanying the bill authorizing the Secretary to sell the Homestead).

6. *Id.*

7. *Id.*

8. 64 Stat. 463.

9. App. to Def.Mot. for Summ.J. at 48 (Fed.Cl. Mar. 14, 1995) (hereinafter Def.App.).

10. Def.App. at 26 (containing the deed of sale).

11. 72 Stat. 931.

12. Pl.App. at 43–44. An earlier version of this bill appeared in H.R. 5426, but, after certain amendments, Congress ultimately referred H.R. 5784 to the Court of Federal Claims. The Act of August 18, 1950, referred to in part (a), authorized the Secretary to sell the Homestead.

13. Pl.App. 60–61 (citing H.Res. 492). House Resolution 492 states that H.R. 5784, "together with all accompanying papers, is referred to the chief judge of the [Court of Federal Claims]."

14. Pl.Resp. to Def.Mot. for Summ.J. at 19–20 (Fed.Cl. Jun. 1, 1995); Compl. at ¶ 29 (Fed.Cl. Jan. 19, 1993).

plaintiff argues that defendant's breach of duty constituted a constructive fraud in that defendant gained an advantage in selling the Homestead and assigning the replacement land to other Indians. Plaintiff alleges actual fraud as a third claim but has chosen not to pursue that count.[15] Finally, plaintiff claims that the duty to retain the Homestead established an implied contract between the parties; plaintiff concludes that defendant's sale of the Homestead breached this contract and constituted a wrongful eviction.

## Discussion

This case is before the hearing officer pursuant to 28 U.S.C. § 1492 (1994), which provides that a bill may be referred by either House of Congress to the chief judge of the Court of Federal Claims for a report in conformity with § 2509 of this title. Under § 2509, the court is directed to report to the appropriate House the facts of the case, including facts bearing upon the question of whether the bar of any statute of limitation should be removed. Further, the court is directed to report conclusions sufficient to inform Congress as to whether the demand is a legal claim, an equitable claim, or a gratuity; and the amount due, if any, from the United States to the claimant.

 In determining the nature of plaintiff's claim, it is noteworthy that the term "legal claim," as used in congressional reference proceedings, has no special meaning. The term refers to a demand based upon a substantive right, the invasion of which is redressable at law. *White Sands Ranchers of New Mexico v. United States,* 14 Cl.Ct. 559, 565 (1988). The term "equitable claim," however, has a particular meaning when used in congressional reference cases. In general, an equitable claim involves an injury, caused by the government, for which there is no enforceable legal remedy—due, for example, to the sovereign immunity bar or the running of the statute of limitations period. *Id.* The key to finding an equitable claim, as well as a legal claim, is the fact that the government is at fault: "defendant's liability must rest on some unjustified act or omission to act which caused plaintiff's damage; otherwise, any

award would be a pure gratuity." *B Amusement Co. v. United States,* 180 F.Supp. 386, 390, 148 Ct.Cl. 337 (1960). A gratuity, therefore, is essentially a gift; it signifies a payment for which plaintiff has failed to establish a legal or equitable entitlement. *White Sands,* 14 Cl.Ct. at 565.

Although the standards applied in a congressional reference case are different from regular proceedings in the Court of Federal Claims, the procedural rules of the court still apply. RCFC App. D, ¶ 1. Accordingly, defendant has moved for summary judgment pursuant to RCFC 56.

## I. Summary Judgment

 Summary judgment procedures are regarded as a method of securing a just, speedy, and inexpensive determination of an action. *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 327 (1986). Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. RCFC 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986); *Jay v. Secretary of Department of Health and Human Services,* 998 F.2d 979 (Fed.Cir.1993). A fact is material if it might significantly affect the outcome of the suit under the governing law. *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510.

 The party moving for summary judgment bears the initial burden of demonstrating the absence of any genuine issue of material fact. *Celotex,* 477 U.S. at 325, 106 S.Ct. at 2553–54; *Jay,* 998 F.2d at 982. If the moving party demonstrates an absence of genuine issues of material fact, then the burden shifts to the non-moving party to show that a genuine factual dispute does exist. *Sweats Fashions, Inc. v. Pannill Knitting Co.,* 833 F.2d 1560, 1563 (Fed.Cir.1987). Alternatively, if the moving party can show that there is an absence of evidence to support the non-moving party's case, then the burden shifts to the non-moving party to proffer such evidence. *Celotex,* 477 U.S. at 325, 106 S.Ct. at 2553–54.

15. Pl.Resp. at 19 n. 8.

Any doubts about factual issues must be resolved in favor of the non-moving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *Litton Indus. Prod., Inc. v. Solid State Systems Corp.*, 755 F.2d 158, 163 (Fed.Cir.1985), to whom the benefit of all presumptions and inferences run. *Jay*, 998 F.2d at 982; *H.F. Allen Orchards v. United States*, 749 F.2d 1571, 1574 (Fed.Cir. 1984), *cert. denied*, 474 U.S. 818, 106 S.Ct. 64, 88 L.Ed.2d 52 (1985). Therefore, this case will be analyzed under these standards as they apply to plaintiff's legal and equitable claims.

Summary judgments were initially prohibited in congressional reference cases. *See* RCFC App. D, ¶ 14 (1976) (indicating that dispositive motions have no application in congressional reference cases). The express restriction has now been removed and replaced with a directive to apply the RCFC to the extent feasible in the case. RCFC App. D, ¶ 1 (1994). Despite the removal of this restriction, questions about the use of summary judgment are still raised today. *E.g.*, *Land v. United States*, 29 Fed.Cl. 744, 750 n. 10 (1993). In *Land*, the hearing officer questioned whether defendant's mere concession of facts for the purpose of summary judgment would be sufficient to satisfy a hearing officer's charge to find facts specifically. *Id.* Nevertheless, the hearing officer in *Land* proceeded to apply summary judgment standards.[16]

In the present case, the same concerns were raised in a status conference with the parties held on January 23, 1996. Based on the matters discussed during this conference, an oral hearing was held on May 30, 1996, in which the parties had an opportunity to further articulate their arguments and present additional evidence. The parties did, in fact, submit additional documents. Further, plaintiff indicates that its claims are dependent upon finding that defendant acquired the Homestead pursuant to the Indian Reorganization Act. Thus, the determination of the statutory basis for acquiring the Homestead could dispose of the entire case. Moreover, both parties indicate that they have submitted all documents relevant to this issue and that additional testimony would not be helpful. Therefore, given the parties' submission of all the relevant documentation on this issue, the lack of a need for further testimony, the parties' opportunities to thoroughly articulate their arguments, and the possibility that summary judgment could resolve the case in a speedy yet just manner, it is appropriate to rule on defendant's motion for summary judgment.

## II. *Legal Claim*

Defendant refers to three instances that arguably put plaintiff on notice that it had a claim: (1) Congress authorizing the Secretary of the Interior to sell the Homestead;[17] (2) the September 28, 1951 notice by the Secretary announcing defendant's intent to sell the Homestead; and (3) Congress designating the replacement lands as part of the Rocky Boy's Reservation on August 27, 1958.[18] Thus, defendant concludes that plaintiff's claim accrued no later than August 27, 1958, and that the six-year limitations period for filing legal claims in this court expired in 1964. Plaintiff claims that equitable reasons preclude applying the statute of limitations.

Title 28 of the United States Code, § 2501, addresses the time for filing suit:

> Every claim of which the United States Court of Federal Claims has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues.

This limitation is a jurisdictional requirement attached by Congress as a condition of the government's waiver of sovereign immunity. *Hopland Band of Pomo Indians v. United States*, 855 F.2d 1573, 1576–77 (Fed.Cir.1988). As such, it must be strictly construed. *Id.* Thus, even assuming plaintiff's argument supports an equitable claim, plaintiff's failure to satisfy the statute

---

**16.** The hearing officer ultimately denied defendant's motion for summary judgment. *Land*, 29 Fed.Cl. at 758.

**17.** 64 Stat. 463 (Aug. 18, 1950).

**18.** 72 Stat. 931.

of limitations bars recovery on a legal claim in a congressional reference case. *Clark v. United States,* 167 Ct.Cl. 197, 198, 1964 WL 8610 (1964); *Inslaw, Inc. v. United States,* 35 Fed.Cl. 295, 306 (1996). Accordingly, it is found that the limitations period codified in 28 U.S.C. § 2501 bars plaintiff's legal claim.[19]

## III. *Equitable Claim*

■ As with legal claims, equitable claims are premised on the notion that defendant's unjust actions caused plaintiff's damage. *B Amusement,* 180 F.Supp. 386, 148 Ct.Cl. at 342; *Estate of Braude v. United States,* 35 Fed.Cl. 99, 109 (1996). In this case, plaintiff has narrowly defined the unjust action to be defendant's breach of its duty to prevent alienation of the Homestead. Plaintiff acknowledges that this duty exists only if defendant acquired the Homestead under the Indian Reorganization Act. Defendant, on the other hand, asserts that it acquired the Homestead pursuant to the National Industrial Recovery Act, which did not establish a fiduciary responsibility to hold the land.

### A. *The Indian Reorganization Act*

On June 18, 1934, Congress passed the Indian Reorganization Act in order to help conserve and develop Indian lands and resources. In the process, Congress imposed a fiduciary relationship upon defendant:

> Title to any lands or rights acquired pursuant to [this act] shall be taken in the name of the United States in trust for the Indian tribe or individual Indian for which the land is acquired, and such lands or rights shall be exempt from State and local taxation.

25 U.S.C. § 465 (1994); *Hydaburg Coop. Ass'n v. United States,* 667 F.2d 64, 67, 229 Ct.Cl. 250 (1981), *cert. denied,* 459 U.S. 905, 103 S.Ct. 207, 74 L.Ed.2d 166 (1982). The *Hydaburg* case, involving an Indian-owned cannery's claim based on this act, determined the scope of this fiduciary relationship. In doing so, the court first turned to the legislative history of the act, which demonstrated that previous Indian acts failed to ensure that Indians had adequate land to satisfy their needs. Instead, these acts allowed Indians to sell their allotted lands to whites. As a result, many Indians had become landless. *Id.* (citing S.Rep. No. 1080, 73d Cong., 2d Sess. 1–2; 78 Cong.Rec. 11727–30 (1934) (remarks of Rep. Howard)). To remedy this, Representative Howard emphasized the need to restrict Indians from selling their land:

> In order to protect the economic future of the Indians and to protect the Government itself against the loss and disintegration of the Indian property, it is most essential to prevent alienation of Indian lands outside of Indian ownership.

78 Cong.Rec. 11730.

Accordingly, section 4 of the Indian Reorganization Act, now 25 U.S.C. § 464, restricted alienation of Indian land:

> Except as provided in [this Act], no sale, devise, gift, exchange, or other transfer of restricted Indian lands or of shares in the assets of any Indian tribe or corporation organized hereunder, shall be made or approved: *Provided, however,* That such lands or interests may, with the approval of the Secretary of the Interior, be sold, devised, or otherwise transferred to the Indian tribe in which the lands or shares are located or from which the shares were derived or to a successor corporation; and in all instances such lands or interests shall descend or be devised, in accordance with the then existing laws of the State, or Federal laws where applicable, in which said lands are located or in which the subject matter of the corporation is located, to any member of such tribe or of such corporation or any heirs or lineal descendants of such member or any other Indian person for whom the Secretary of the Interior determines that the United States may hold in trust: *Provided further,* That the Secretary of the Interior may authorize voluntary exchanges of lands of equal value and the voluntary exchange of shares of equal value whenever such exchange, in his judgment, is expedient and beneficial

---

**19.** The decision on this issue is consistent with plaintiff's own characterization of its claim as an equitable one, rather than a legal claim. Pl.

Resp. at 15; Transcript of Oral Hearing held on May 30, 1996, 38 (Fed.Cl. Jun. 4, 1996) (hereinafter Tr.).

for or compatible with the proper consolidation of Indian lands and for the benefit of cooperative organizations.

Based on the language in these sections and the legislative history of the Indian Reorganization Act, the Court of Claims reasoned that the act imposes a duty on the United States to hold the lands acquired under this act so as to prevent alienation. *Hydaburg,* 667 F.2d at 68. As for the method of acquiring lands, the act gave the Secretary several options:

> The Secretary of the Interior is hereby authorized, in his discretion, to acquire, *through purchase, relinquishment, gift, exchange, or assignment,* any interest in lands, water rights, or surface rights to lands, within or without existing reservations, including trust or otherwise restricted allotments, whether the allottee be living or deceased, for the purpose of providing land for Indians.

25 U.S.C. § 465 (emphasis added).

If the Secretary chose to acquire the lands through purchase, Congress authorized the Secretary to appropriate funds in order to do so:

> For the acquisition of such lands, interests in lands, water rights, and surface rights, and for expenses incident to such acquisition, there is authorized to be appropriated, out of any funds in the Treasury not otherwise appropriated, a sum not to exceed $2,000,000 in any one fiscal year....

*Id.*

▮▮ If defendant acquired the Homestead pursuant to this act, defendant would have been obligated to hold the Homestead and defendant's subsequent sale would constitute a breach of this fiduciary duty. Thus, it must be determined whether the facts presented indicate that defendant acquired the Homestead under the Indian Reorganization Act.

### B. *Duty to Hold Land*

Plaintiff asserts that the Indian Reorganization Act does not describe precise procedures for acquiring lands. Rather, plaintiff contends that the act grants the Secretary of the Interior broad discretion in obtaining the lands either through purchase, relinquishment, gift, exchange, or assignment. Plaintiff points out that the procedures used by the Secretary to purchase the Homestead fall within the broad scope of options given to him under the Indian Reorganization Act. Thus, plaintiff concludes that defendant purchased the Homestead pursuant to this act and became bound to prevent alienation.

Contrary to plaintiff's assertion, the Indian Reorganization Act is not completely devoid of procedures for obtaining land. Section 5 authorizes the Secretary to appropriate funds from the Treasury and use these funds to purchase the land for the Indians. 25 U.S.C. § 465; *Hydaburg,* 667 F.2d at 68. The facts before us, however, do not demonstrate that the funds used to purchase the Homestead originated under § 5 of the Indian Reorganization Act. First, the appropriations under the Indian Reorganization Act did not become available until May, 1935, two and one-half months after defendant purchased the Homestead.[20] National Industrial Recovery Act funds, however, were available by that time: section 208 made available $25 million for the purchase of subsistence homesteads. Of this $25 million, the Secretary of the Interior set aside $400,000 for use by the Indian Subsistence Homestead Authority.[21] The Commissioner allotted $48,000 of the $400,000 for projects concerning the Great Falls, Montana area.[22] Defendant used $8,808.07 of these funds to purchase the Homestead.[23] Thus, the money used to purchase the Homestead can be traced directly to the funds appropriated pursuant to the National Industrial Recovery Act.

---

**20.** 1935 Secretary of the Interior Ann.Rep. 115.

**21.** Pl.App. at 28.

**22.** Pl.App. at 29 (containing a memorandum from the Commissioner to the Secretary regard-

ing funds allocated from the National Industrial Recovery Act).

**23.** Def.App. at 52 (containing May 31, 1988 memorandum to the Deputy Assistant Secretary—Indian Affairs).

Furthermore, it is significant that none of the supporting documents cited by plaintiff or defendant refer to the Indian Reorganization Act. Instead, they refer to the National Industrial Recovery Act. For example, in the order establishing subsistence homesteads, the Secretary repeatedly refers to the authority granted under Title II, § 208 of the National Industrial Recovery Act as the basis for his conduct.[24] Defendant's notice of sale, published on September 28, 1951, describes the Homestead as "Government-owned lands located in ... Great Falls, Montana (also known as the Great Falls Subsistence Homestead), *acquired in 1935 under authority of Section 208 of Title II of the National Recovery Act of June 16, 1935 (48 Stat. 200)."* [25] The April 10, 1952, deed representing defendant's sale of the Homestead states in relevant part:

> WHEREAS the United States of America heretofore, to wit, in the year 1935, and *under the authority of section 208 of Title II of the National Industrial Recovery Act of June 16, 1933* (48 Stat. 200) acquired title to a tract of land in the County of Cascade and the State of Montana, known as the Great Falls Subsistence Homestead, for the benefit of certain landless Indians in the vicinity of Great Falls, Montana. . . . [26]

Moreover, it is noted that the term "subsistence homestead," a label consistently used in these and other documents,[27] is a term found in the National Industrial Recovery Act. None of the documents presented refer to the Indian Reorganization Act. Plaintiff contends that such references are not required when acting pursuant to the Indian Reorganization Act. Plaintiff's observation, however, does not explain the consistent references to an alternate act—the National Industrial Recovery Act—which does not establish the same fiduciary duties. Therefore, it is found that defendant purchased the Homestead under the National

Industrial Recovery Act which, as plaintiff acknowledges, did not impose a duty to retain plaintiff's land.[28]

At the oral hearing, plaintiff raised a new argument in favor of applying the Indian Reorganization Act standards.[29] Plaintiff contended that, assuming defendant originally purchased the Homestead through the National Industrial Recovery Act, the Secretary lost control of the Homestead during 1935 as the Supreme Court was in the process of declaring provisions in the act unconstitutional. Thus, when authority over the Homestead was transferred back to the Secretary in 1937, plaintiff asserted that the National Industrial Recovery Act was no longer available as a basis for reacquiring the land. Plaintiff noted, however, that the Secretary's recovery of the Homestead from the Resettlement Administration fell within the penumbra of authority granted in the Indian Reorganization Act. Therefore, even if the Secretary believed that he was still acting pursuant to the authority of the National Industrial Recovery Act, plaintiff concluded that the Secretary must have necessarily been operating under the broad authority granted by the Indian Reorganization Act.

Plaintiff, however, cited no authority for the proposition that the National Industrial Recovery Act in its totality, or Title II, section 208 in particular, had ever been declared unconstitutional; nor could any such authority be found. Rather, relevant cases demonstrate that the Supreme Court addressed only the specific provisions relevant to each case. *E.g., Schechter,* 295 U.S. 495 (addressing Title I, section 3 of the National Industrial Recovery Act); *Panama,* 293 U.S. 388 (addressing Title I, section 9(c)). In addition, the documents submitted by both parties demonstrate that the subsistence homestead provisions of the National Industrial Recovery Act remained viable while the President transferred authority from the Secretary to the Resettlement Administra-

---

24. Pl.App. at 27–28.

25. Def.App. at 48 (emphasis added).

26. Def.App. at 26 (emphasis added).

27. *E.g.,* Pl.App. at 35 (containing a letter from the Commissioner to the Secretary regarding the "Subsistence Homesteads"); H.R. 5784.

28. Pl.Resp. at 13.

29. Tr. 29–31.

tion and back. With Executive Order 7041, for example, the President, acting "[b]y virtue of and pursuant to the authority vested ... by title II of the National Industrial Recovery Act" transferred to the Resettlement Administration all real property and funds "made available to carry out the provisions of section 208 of title II of the said ... Act." When the President transferred oversight of the Homestead back to the Department of Interior, he once again based his action on the authority granted by the National Industrial Recovery Act.[30] These documents, as well as others quoted above, show that this act served as a constant basis for defendant's authority over the Homestead.

Although the two acts have overlapping purposes and compatible grants of authority, the facts regarding the funding, the citations to the National Industrial Recovery Act in the documents, as well as the characterization of the land as a homestead, demonstrate that the Homestead was purchased under the National Industrial Recovery Act. Moreover, these factors illustrate that the National Industrial Recovery Act remained as a basis for authority when defendant transferred the Homestead back to the Secretary. Because it is found that the Secretary's authority over the Homestead was governed by the National Industrial Recovery Act at all relevant times, it follows that the duty to prevent alienation, as imposed by the Indian Reorganization Act, never took effect. Therefore, defendant's sale of the Homestead was not an unjust action and plaintiff has not established an equitable claim.

Although this conclusion disposes of plaintiff's case, the remaining issues raised by the parties will be addressed in the interest of fully apprising Congress of the facts in this case.

### C. Statute of Limitations

■ Defendant asserts that plaintiff should have known of the sale during the 1950's when Congress enacted statutes and issued notices addressing the sale. Defendant concludes that plaintiff filed its suit long after the six-year limitations period lapsed.

Plaintiff, in response, claims that the notice of sale was directed at potential buyers rather than the Indians and therefore cannot be considered notice to plaintiff. Plaintiff asserts that defendant's failure to personally notify plaintiff's members justifies waiving the statute of limitations as a matter of equity. As previously discussed, however, defendant had no duty to retain the Homestead for plaintiff because defendant purchased the land pursuant to the National Industrial Recovery Act. Moreover, plaintiff's members never actually built homes on the Homestead. Accordingly, defendant had no duty to personally notify plaintiff of the sale, and plaintiff has not set forth an adequate equitable basis for removing the statute of limitations bar.

### D. Intended Beneficiary

■ One of plaintiff's counts involves a claim for wrongful eviction and is based upon an alleged contract implied in fact. Defendant points out that plaintiff must establish the elements required for all contracts: mutual intent to form a contract, offer, acceptance, and consideration. Defendant asserts that the documents demonstrate that the lands were purchased for homeless Indians in general rather than plaintiff in particular. Hence, defendant concludes there was no mutual intent between the parties. Plaintiff claims that there is a factual dispute as to the intended beneficiary of the Homestead.

The deed of April 10, 1952, identifies the particular Indians that were to have benefitted from the Homestead as "certain landless Indians in the vicinity of Great Falls, Montana."[31] Furthermore, the letter written by Assistant Commissioner William Zimmerman to the superintendent of the Rocky Boy's Reservation indicated that the Homestead was for "the benefit of the thirty odd Indian families who were then living ... on Hill No. 57."[32] Plaintiff's members were in fact landless Indians living on Hill 57, which is located in the vicinity of Great Falls, Montana. Further, Congress has already determined that plaintiff is the one to compensate for any

---

**30.** Pl.App. at 52.

**31.** Def.App. at 26.

**32.** Pl.App. at 54.

damages arising out of defendant's sale of the Homestead.[33] Thus, had a duty to prevent alienation of the Homestead been found, plaintiff would have been the intended beneficiary of that duty.

### Conclusion

It is found that the statute of limitations period in this case expired, at the latest, on August 27, 1964, six years after Congress assigned the lands that replaced the Homestead to the Rocky Boy's Reservation.[34] Plaintiff's legal claim, filed January 19, 1993, is therefore barred. In addition, it is found that defendant acquired the Homestead pursuant to the National Industrial Recovery Act rather than the Indian Reorganization Act. Because lands acquired under the National Industrial Recovery Act do not obligate defendant to prevent alienation, defendant's sale of the Homestead did not violate any such duty to plaintiff. Thus, plaintiff's equitable claim lacks the required unjust action by defendant. As a result, any payment to plaintiff would be a gratuity. Furthermore, for the above stated reasons, defendant's motion for summary judgment should be granted.